[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16449
_____

D.C. Docket No. 2:10-cr-00048-SPC-CM-1


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

versus

NELSON CRISTIANO MACHADO, JR.,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(March 30, 2018)

Before MARCUS, ANDERSON and HULL, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, defendant Nelson Cristiano Machado appeals his three convictions for wire fraud and his 36-month sentence. After thorough review, and with the benefit of oral argument, we affirm.

## I.    2010 INDICTMENT

Originally from Brazil, Machado came to the United States in 1992. He lived in the Orlando, Florida area from 2005 to 2009. In 2009, Machado was living in Bradenton, Florida, but he moved back to Brazil in December. Shortly after Machado left for Brazil, in April 2010, a federal grand jury indicted him for wire fraud. Still living in Brazil, Machado visited the United States in January 2016 and was arrested at the airport based on an outstanding federal indictment that was filed back in 2010. We review that indictment and then the trial evidence presented to the jury that convicted him.

On April 7, 2010, a federal grand jury charged Machado with three counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. The indictment charged that, from July 8, 2005 through November 3, 2005, Machado knowingly made false representations as part of a scheme to obtain mortgage loans. The indictment also charged that, as a result of his false representations, Machado obtained: (1) a mortgage loan for $343,000 from American Brokers Conduit on September 23, 2005 (Count 1); (2) a mortgage loan for $147,000 from American Brokers Conduit on September 23, 2005 (Count 2); and (3) a mortgage loan for $249,900

2

from HSBC Mortgage Corporation on November 3, 2005 (Count 3).  After his January 2016 arrest, Machado pled not guilty and his trial began on June 21, 2016.

## II.    TRIAL EVIDENCE

The trial evidence established that in the fall of 2005, Machado bought three properties in Lee County, Florida, two of which were the subject of the indictment. To facilitate the two purchases referred to in the indictment, Machado applied for and obtained three mortgage loans worth a total of $739,900.  When he applied for the loans, Machado had a monthly salary of $3,000 and very little savings, but the monthly payments for those three loans totaled $5,322.94.  Machado was a pastor at a Brazilian church in Bradenton, Florida, and he led the services in Portuguese. Machado spoke little English.

### A.    Property 1

As to Counts 1 and 2, on August 16, 2005, Machado entered into a contract to buy the property located at 2142 Southeast 18th Avenue, Cape Coral, Florida 33990 for $509,900 ("Property 1").  To finance this property, Machado applied for two mortgages from American Brokers Conduit ("ABC")—a first mortgage in the amount of $343,000 and a second mortgage in the amount of $147,000.  Machado used a mortgage broker in Boca Raton, Florida, Transatlantic Mortgage Lending

3

Group, Inc. ("Transatlantic"), and one of its agents, Fabricio Monteiro, to help him secure these loans.

Loan applications are usually completed by the mortgage broker. Machado's loan applications, which contained his information and signature, falsely stated that Property 1 in Cape Coral would be Machado's primary residence, that he was employed as a manager at Shalom Tile Corporation, and that he had $74,979 in his personal bank account. Each loan application was supported by false documents regarding Machado's employment and the balance of his bank account.

When deciding whether to fund a mortgage loan, lenders like ABC rely on information about the borrower's employment, assets and liabilities, and intended use for the property. Based on the information submitted, ABC decided to approve Machado's loan and wired the proceeds from banks located in New York to Cape Coral Title Insurance Agency's ("Cape Coral Title") bank located in Florida.

On September 26, 2005, after the wire transfers were completed, Machado personally went to the closing for Property 1 at Cape Coral Title. At trial, a closing officer for Cape Coral Title, Teri Denison, testified that the company's standard practice was to make sure the borrower understood the material terms of what he or she was signing. On this particular closing, Denison put together the file but a coworker attended the closing on her behalf. Denison could not say

4

whether a translator was present that day, but she indicated that, in her experience, Cape Coral Title would not conduct a closing if there was not someone with the borrower to translate the documents.[1]

At the closing, Machado personally signed several documents. First, he signed loan applications identical to the earlier false applications that had been submitted to ABC. Second, he signed occupancy agreements and occupancy certifications, agreeing that the Cape Coral property was to be his primary residence. Third, he signed Truth in Lending disclosures for the loans, which set forth the monthly payments required for the two mortgages. The disclosure indicated that Machado's monthly payments for the two mortgages would be approximately $3,502.17.[2]

Fourth, also at the closing, Machado signed HUD-1 statements for the loans, which stated the sale price of the property, the amount of the loans, and the earnest money deposit. The HUD-1 statement specified that the borrower was required to pay a $2,000 deposit. It also indicated that the borrower was required to bring $14,586.12 to the closing, which Machado paid through a cashier's check that he purchased.

---

[1]In 2005, title agencies were not required, and it was not Cape Coral Title's policy, to provide translated versions of the documents to borrowers who did not speak English.

[2]At trial, several witnesses acknowledged that Machado's signatures on the earlier sales contracts, loan applications, and other documents associated with the loan applications looked different from his signature on the same types of documents that Machado personally signed at the closing.

At the closing, Machado also brought a $2,000 check made out to Cape Coral Title.  The check came from Machado's bank account and was signed by him.

**B.     Property 2**

As to Count 3, on July 8, 2005, Machado entered into a contract to buy the property located at 4118 Southwest Santa Barbara Place, Cape Coral, Florida 33914 for $249,900 ("Property 2").  To finance this purchase, Machado applied for a mortgage loan from HSBC Mortgage Corporation ("HSBC") in the amount of $249,900.  Similar to the two applications for Property 1, the loan application for Property 2 falsely stated that it would be Machado's primary residence, that he was employed as an area manager at Shalom Tile Corporation, and that he had $74,979 in his bank account.  This loan application was supported by a fake pay stub from Shalom Tile Corporation and a false document verifying Machado's bank account.

On this application, Machado failed to disclose the two mortgages he had already obtained on Property 1.  Machado also failed to disclose that, on October 20, 2005, he had obtained a mortgage on another property in Fort Myers. Transatlantic and Fabricio Monteiro assisted with securing the loan by submitting the loan documents to HSBC.

When deciding whether to fund a mortgage, HSBC relies on information like owner occupancy, reported income, liquid assets, and other liabilities.  Based

6

on the information submitted, HSBC decided to approve Machado's loan and wired the proceeds from its bank in New York to Gulf Breeze Title Insurance Agency's ("Gulf Breeze Title") bank in Florida.

On November 3, 2005, Machado attended the closing for Property 2 at Gulf Breeze Title. Mortgage documents demonstrated that Machado's wife, Kelma, was listed as a borrower and also attended the closing. It is undisputed that Kelma spoke English. A closing officer for Gulf Breeze Title, Suzanne Scalise, handled the closing.

At trial, Scalise testified that she did not remember this particular closing but that it was her general practice to fully explain each document to the borrower and wait for an affirmation of understanding before proceeding further. If a borrower did not speak English, Scalise indicated that she would not have proceeded unless there was someone present who could translate.

At this property closing, Machado signed several more documents. First, Machado signed a loan application identical to the false applications that had been submitted to HSBC. Second, he signed an owner occupancy affidavit, confirming that the property was to be his primary residence. Third, Machado signed a Truth in Lending disclosure, which set forth the payments required by the loan. This

disclosure indicated that Machado's monthly payment for this mortgage would be approximately $1,820.77.[3]

Fourth, at the closing for Property 2, Machado also signed a HUD-1 statement, which specified the sale price of the property, the amount of the loan, and the earnest money deposit. The HUD-1 form stated that the borrower was required to pay a $2,000 deposit. Prior to closing, Machado provided Gulf Breeze Title with a signed $2,000 check from Machado's bank account as an escrow deposit.

At the conclusion of trial, the jury convicted Machado on all three wire fraud counts.

## III.    SENTENCING HEARING

At sentencing, the district court directly addressed Machado, through a Portuguese interpreter, to confirm that he had had the opportunity to discuss the presentencing investigation report ("PSI") with his attorney, and that his attorney was able to answer his questions about the PSI. Defense counsel stated a "general overall objection to the facts" in the PSI, and the district court stated that it would consider that objection to be a "general denial of the allegations as contained within the case." The district court found that Machado had a total offense level of 19 and a criminal history category of I, which yielded an advisory guidelines range

---

[3]The $3,502.17 for the first two loans, with the $1,820.77 for the third loan meant that Machado had monthly payments of $5,322.94.

of 30–37 months' imprisonment.  Machado's counsel proceeded to argue for a sentence below that advisory guidelines range.

After defense counsel's argument, the district court asked, "Does Mr. Machado wish to make a statement at this time?"  Machado's counsel responded, "No, Your Honor."  The district court never addressed Machado personally.  The government then recommended a sentence of 30 months.  At the close of the government's argument, the district court asked Machado's counsel if he had anything further to present, and counsel said no.

The district court sentenced Machado to 36 months' imprisonment as to each count, to run concurrently.  The district court asked if there were any objections, and Machado's counsel stated, "[n]one other than those previously articulated." Machado timely appealed his three convictions and sentence.

## IV.    RIGHT TO A SPEEDY TRIAL

On appeal, Machado contends that his convictions are invalid because he was denied his right to a speedy trial.  We review the factual background as to that issue and then the relevant law and analysis.

### A.    Motion to Dismiss the Indictment

Prior to trial, Machado moved to dismiss his indictment, arguing a violation of his Fifth and Sixth Amendment right to a speedy trial.  On behalf of dismissal, Machado argued four points: (1) the over-five-year delay from the time of his 2010

indictment until his 2016 arrest was presumptively prejudicial; (2) the government made no effort to find him while he was in Brazil from 2009–16; (3) Machado timely asserted his speedy trial rights; and (4) the delay in Machado's prosecution weakened his ability to raise defenses, procure his own witnesses, and elicit more specific testimony from the government's witnesses.[4]  The government opposed Machado's motion.

## B.　　Evidentiary Hearing

The district court held an evidentiary hearing on Machado's motion, at which three witnesses testified.

The first witness was Kedma Miranda, Machado's sister-in-law.  Miranda testified that in 2009, Machado, then living in Florida, received a job offer to work as a pastor in Brazil.  Machado moved back to Brazil in December 2009.  He later visited the United States and stayed at his sister-in-law Miranda's house in Orlando three times: (1) for two weeks in February 2010; (2) two and a half weeks in May 2010; and (3) over two months in December 2014 to early February 2015.  During that last visit, Machado received a Florida driver's license, obtained a credit card, and opened a bank account.

When Machado returned to Brazil in February 2015, Miranda applied for temporary custody of Machado's children, and they stayed in the United States.

---

[4]On April 15, 2016, Machado amended his motion to clarify factual information about the length and extent of his trips to the United States between the indictment and his arrest.

Miranda testified that no one in her Orlando home knew that there was a warrant for Machado's arrest. Miranda conceded, however, that her home was in a different county than Machado's former house in Bradenton.

The second witness was Roberto Peña, a U.S. Customs and Border Protection officer. Officer Peña testified that he became involved in the investigation when he ran a check on a January 2016 flight from Brazil and saw that there was an arrest warrant for one of its passengers, Machado. Officer Peña contacted the FBI to confirm the warrant and advised officers to intercept Machado at the airport.

Officer Peña later researched Machado's travel history and discovered that, after the December 2009 departure, Machado returned to the United States on February 22, 2010 and left again on March 21, 2010. Machado returned again on May 25, 2010 and left on June 25, 2010. Over four years later, Machado returned to the United States on December 10, 2014 and then left on February 9, 2015. Machado's final return to the United States was on January 21, 2016, when he was arrested. Officer Peña testified that some of these travel entries, specifically the outbound flights, did not show up in his initial search because of the varied use of Machado's suffix, middle initial, and date of birth.

The third witness was Grant Wagner, a special agent with the Florida Department of Law Enforcement ("FDLE"). Agent Wagner testified that he began

11

investigating Machado as part of a task force involving mortgage fraud. In November 2009, Agent Wagner first tried to make contact with Machado at his last-known address in Bradenton. At the house were Machado's parents. Wagner left his business card and asked them to have Machado contact him. The business card identified Wagner as an FDLE special agent and included his cell phone number.

Later that same day, Agent Wagner received a phone call from Machado, who spoke little English and asked Wagner to speak with Kelma, Machado's wife. Wagner spoke with Kelma and explained that he "wanted to talk about some of the properties in Lee County." Kelma told Wagner that she and Machado were willing to talk, but they were out of town until the following week. Wagner admitted that he told Kelma that he would attempt to locate a Portuguese translator and contact them at a later date. Wagner never reached back out and did not recall any further contact with Machado or Kelma.

The day after Machado was indicted in April 2010, Agent Wagner made efforts to locate Machado. For example, Wagner returned to Machado's former Bradenton address to arrest him, but someone else was living at the house who knew Machado. That person at the house explained that her husband took over as pastor at Machado's former church and she thought that Machado had moved back to Brazil. Wagner then went to Machado's former church, where Machado had

served as a pastor, but Machado was not there either.  A church employee told Wagner that she thought Machado had moved back to Brazil.[5]

Agent Wagner eventually contacted Homeland Security and was told that Machado had already left the United States in March 2010.  Thereafter, Wagner checked several databases periodically to see if Machado had renewed his driver's license, gotten a job in the United States, or indicated his presence in some other fashion.  Wagner did not document every one of his searches, but he did record at least one search in February 2014.  This February 2014 analysis of various databases revealed that Machado did not have a current driver's license or employment in the United States.[6]  Wagner stated that he did not receive any notice of Machado's return to the United States before 2016.

Wagner also confirmed that Machado's arrest warrant was entered into the National Crime Information Center ("NCIC") system soon after the April 2010 indictment.  The NCIC system allows law enforcement to cross-reference arrest warrants nationwide.  To Wagner's knowledge, the warrant remained active in the NCIC system until Machado's arrest in 2016.

----

[5]Machado complains that Wagner did not contact the woman's husband who had taken over the role of pastor or investigate whether this church had any connection to Machado's new church in Brazil.  But, as explained later, we look at what steps Agent Wagner actually took to locate Machado, not at each thing the government could have also done.

[6]Wagner's database checks did not query for newly opened banking or credit card accounts.

13

## C.    District Court's Order

In its order dated May 12, 2016, the district court denied Machado's motion to dismiss the indictment.  The district court weighed the four factors set out in Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182 (1972), and concluded that the government had not deprived Machado of his right to a speedy trial.  In doing so, the district court determined: (1) the delay was sufficient to trigger a speedy trial inquiry; (2) the government did not deliberately delay Machado's arrest and acted in good faith and with due diligence; (3) Machado timely invoked his speedy trial rights; and (4) Machado did not establish prejudice.

## D.    Our Analysis of the Barker Factors

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const., amend. VI.  The Supreme Court has established a four-factor test to determine whether a defendant has been deprived of the constitutional right to a speedy trial: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) the actual prejudice to the defendant. Barker, 407 U.S. at 530, 92 S. Ct. at 2192.  Machado contests only the district court's findings and conclusions as to the second and fourth factors.[7]

---

[7] Whether the government deprived a defendant of the constitutional right to a speedy trial is a mixed question of fact and law.  United States v. Villarreal, 613 F.3d 1344, 1349 (11th Cir. 2010).  We review a district court's factual findings for clear error and its legal conclusions

14

As to the second Barker factor about the reason for the delay, we weigh the relative culpability of the government and the defendant for the delay. United States v. Bagga, 782 F.2d 1541, 1543 (11th Cir. 1986) ("[T]he conduct of the government must be weighed against the conduct of the defendant."). Consistent with this notion, "deliberate attempt[s] to delay the trial . . . should be weighted heavily against the government," whereas a more neutral reason such as negligence should be weighted less heavily. Barker, 407 U.S. at 531, 92 S. Ct. at 2192. The longer the delay, however, the heavier the government's negligence must be weighted. Doggett v. United States, 505 U.S. 647, 657, 112 S. Ct. 2686, 2693 (1992) ("[T]he weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows."). The burden is on the government to explain the cause of pre-trial delay. United States v. Ingram, 446 F.3d 1332, 1337 (11th Cir. 2006).

In cases where the defendant is missing, "the government is not required to exhaust all conceivable avenues" in finding him or her. Bagga, 782 F.2d at 1543. The Sixth Amendment mandates only a "diligent, good-faith effort" on behalf of the government to find the defendant and bring him or her to trial. Id. (quotation marks and citation omitted). While the defendant's absence from the country does

---

de novo. Id. "A factual finding is clearly erroneous only if, after we review the evidence, we are left with the definite and firm conviction that a mistake has been committed." Id. (citation and internal quotation marks omitted).

15

not wholly relieve the government of its obligation, the government is not required to pursue "futile legal gestures" in the face of uncertain extradition. Id.

Our precedent in United States v. Bagga, 782 F.2d 1541, 1543 (11th Cir. 1986), is instructive. In Bagga, the defendant left for India after learning his wife had become ill and was indicted in absentia. Id. at 1542. Upon returning to the United States nearly six years later, the defendant turned himself in and moved to dismiss his indictment on speedy trial grounds. Id. The district court held an evidentiary hearing and then denied the defendant's motion to dismiss. The evidence showed that law enforcement had registered the defendant in a national crime information network and had attempted to locate him at his last-known address and at a restaurant owned by his family. Id. at 1543–44.

On appeal, the defendant Bagga claimed that the government's investigation was insufficient because there was no notice placed on his passport and because the government did not seek to extradite him to the United States. Id. at 1543. In affirming the district court's denial of Bagga's motion, this Court determined that the defendant's contentions about the passport pushed the government's obligation "too far" and that the government is not tasked with pursuing every lead on the "off-chance" that someone may have knowledge of the defendant's exact address abroad. Id. at 1543–44 ("The best that can be said is that if the

16

government was at fault for not locating Bagga in India, it was clearly no more than mere negligence.").

Here, the district court did not err by concluding that the government made good-faith, diligent efforts to locate and arrest Machado.[8]  In fact, compared to the law enforcement in Bagga, Agent Wagner engaged in similar, if not greater, investigative efforts.  Id.  In November 2009, Wagner attempted to locate Machado in Bradenton, Florida.  Wagner left a business card with Machado's parents that identified him as a special agent with the FDLE and provided a contact number.  Wagner then spoke with Machado on the phone and, through Machado's wife, informed Machado that he wanted to discuss the properties in Lee County.[9]

Approximately a month later, Machado left for Brazil and did not tell Agent Wagner.  After Machado's indictment was returned in April 2010, Wagner attempted to arrest Machado at his last-known address in Bradenton and also visited Machado's former church.  Individuals at both locations corroborated that

---

[8]The district court's order contained a slight error, stating that Machado "left the country with his family, and never contacted Agent Wagner despite being requested to do so pre-indictment."  While it is true that Machado did not reach back out to Agent Wagner after their November 2009 conversation, nothing in the record evidence suggests that Agent Wagner asked him to do so.  The district court's order conflates their conversation with Agent Wagner's request that Machado's parents have Machado contact him, which Machado did.  Notwithstanding this error, we affirm the remainder of the district court's factual findings and analysis.

[9]Despite Wagner's assurance of seeking a translator and Machado's knowledge that law enforcement was trying to contact him about properties in Lee County, the record suggests that neither Wagner nor Machado attempted further phone contact after this initial call.  As to relative culpability, this fact is largely neutral.  See Bagga, 782 F.2d at 1543.

17

they "thought" Machado had moved back to Brazil.  Thereafter, Wagner placed Machado's arrest warrant for interception within the NCIC system and periodically checked to see if Machado had renewed his driver's license, drawn a wage, or otherwise returned to the United States.

While Machado returned to the United States for brief periods of time in 2010 and 2014, he resided with his sister-in-law in a different county, utilized different variations of his name for travel, and never attempted to contact Wagner. Wagner was not aware of Machado's presence in the United States until the arrest in 2016, and Wagner's database searches did not uncover Machado's updated license, credit card, or bank account.  These failures speak more to technological gaps than to Wagner's negligence.  Wagner's efforts included planned interception of Machado at the border via the NCIC system and periodic searches for indicia of Machado's continued presence in the United States.  These efforts were carried out in good faith and with due diligence, and were all that was required of Wagner.[10] The district court's factual findings in this regard were not clearly erroneous.[11]

---

[10]The government was not required to seek extradition in this wire fraud case involving only $739,000 in loans.  Although, in his brief, Machado contends that there is an extradition treaty between the United States and Brazil covering wire fraud, neither the Brazilian Constitution nor that treaty imposes a requirement for the extradition of a Brazilian national in a case like this.  See Treaty and Additional Protocol Signed at Rio de Janeiro, U.S.-Braz., art. VII, Dec. 17, 1964, 15 U.S.T. 2093 ("There is no obligation upon the requested State to grant the extradition of a person who is a national of the requested State . . . .").

[11]Alternatively, because the government at a minimum acted in good faith, any alleged failure to more diligently pursue Machado should not weigh heavily against the government. See Ingram, 446 F.3d at 1339–40.

18

As to the fourth <u>Barker</u> factor about prejudice, Machado has not demonstrated actual prejudice. "[T]he defendant must demonstrate actual prejudice unless each of the first three factors 'weigh[s] heavily against the government.'" <u>United States v. Harris</u>, 376 F.3d 1282, 1290 (11th Cir. 2004); <u>United States v. Mitchell</u>, 769 F.2d 1544, 1547 (11th Cir. 1985) ("[U]nless the first three <u>Barker</u> factors all weigh heavily against the government, the defendants must demonstrate actual prejudice."). Because the first three <u>Barker</u> factors do not all weigh heavily against the government, Machado was required to demonstrate actual prejudice.

To show actual prejudice, the defendant must show (1) oppressive pretrial incarceration, (2) his own anxiety and concern, or (3) the possibility that his defense was impaired because of the delay. <u>United States v. Dunn</u>, 345 F.3d 1285, 1296 (11th Cir. 2003). Because Machado contends he was not aware of the 2010 indictment, Machado argues only that the delay prejudiced his ability to prepare a complete defense. Such prejudice may be demonstrated through the death or disappearance of a witness or by a <u>defense</u> witness's inability to "recall accurately events of the distant past." <u>Barker</u>, 407 U.S. at 532, 92 S. Ct. at 2193. Yet, as this Court has held, mere conclusory allegations are insufficient to establish actual prejudice. <u>United States v. Hayes</u>, 40 F.3d 362, 366 (11th Cir. 1994).

Machado contends that he suffered actual prejudice from being unable to locate persons and records associated with Transatlantic, the mortgage broker, after it went out of business. Machado argues that he could not find witnesses to authenticate documents from the now-defunct company or to show how Transatlantic duped him. However, Machado's argument fails because he did not offer evidence about when Transatlantic went out of business, and Machado was largely in Brazil after his indictment. On the record before us, it is mere conjecture that Transatlantic witnesses regarding Machado's 2005 loans would have been any more available in 2010 than they were in 2016. In any event, it is not clear what witnesses Machado would have called or what evidence he would have presented, and a conclusory allegation of prejudice is insufficient.

Machado also argues that he was prejudiced by the inability of government witnesses to recall certain, specific facts due to fading memories. His argument ignores that the government carries the burden of proving its criminal case beyond a reasonable doubt and that any deficiency of the government's witnesses was suffered equally, if not more so, by the government. See United States v. Loud Hawk, 474 U.S. 302, 315, 106 S. Ct. 648, 656 (1986) ("[D]elay is a two-edged sword."). Alternatively, the closing officers from 2005 who testified for the government conducted many closings, and Machado has not shown they would

have remembered these particular closings any more in 2010 than in 2016. Machado has not demonstrated actual prejudice on that basis either.

For all these reasons, we conclude that Machado's right to a speedy trial was not violated.

## V.    SUFFICIENCY OF THE EVIDENCE

Machado asserts that the trial evidence was insufficient to prove that he possessed culpable knowledge necessary for his wire fraud convictions because he spoke little English and the real estate documents, which were written in English, were not explained to him.  As he did at trial, Machado continues to aver that he was "lured" into these house purchases by an "unscrupulous" mortgage broker who altered documents with falsehoods and submitted them without Machado's knowledge.[12]

To sustain a conviction for wire fraud, under 18 U.S.C. § 1343, the government must prove that the defendant: "(1) participated in a scheme or artifice to defraud; (2) with the intent to defraud; and (3) used, or caused the use of, interstate wire transmissions for the purpose of executing the scheme or artifice to defraud."  United States v. Martin, 803 F.3d 581, 588 (11th Cir. 2015) (quoting

---

[12]We review de novo challenges to the sufficiency of the evidence to support a conviction.  United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003) (involving wire fraud convictions).  In so doing, we draw all reasonable inferences and resolve all questions of credibility in favor of the government.  Id.  And thus, as a practical matter, we affirm the verdict "if a reasonable juror could conclude that the evidence establishes guilt beyond a reasonable doubt."  Id.

21

United States v. Williams, 527 F.3d 1235, 1240 (11th Cir. 2008)).  Machado

argues that the government failed to prove intent to defraud.

Wire fraud may be proven by circumstantial evidence.  Id.  Likewise, a jury

may infer the "intent to defraud" from the defendant's conduct and circumstantial

evidence.  See United States v. Maxwell, 579 F.3d 1282, 1301 (11th Cir. 2009).

Evidence that the defendant profited from a fraud may also provide circumstantial

evidence of the intent to participate in that fraud.  United States v. Naranjo, 634

F.3d 1198, 1207 (11th Cir. 2011).

Viewed in the light most favorable to the government and the jury's verdict,

the record evidence sufficiently established that Machado knowingly participated

in a scheme to obtain over $700,000 in fraudulent loans from various banking

institutions by making material misrepresentations.  Machado's loan applications

each contained false statements about his intended use for the collateral, his assets

and liabilities, and his employment status.

We recognize that the trial evidence suggested that mortgage brokers, such

as Transatlantic, typically complete the initial loan applications and that some of

Machado's signatures appeared different than his known signature and thus

appeared to be forged.  However, at the property closings, Machado signed

numerous documents containing material misrepresentations identical to those in

22

his initial loan applications, effectively adopting these falsehoods and positively confirming his role in the scheme to defraud the mortgage lenders.

These documents at the closings included not only loan applications matching those ostensibly submitted earlier by his mortgage broker but also included occupancy agreements and certifications, Truth in Lending disclosures, and HUD-1 statements. Apart from the loan applications themselves, the occupancy documents confirmed Machado's stated intent to use each property as a primary residence. Machado also presented signed deposit checks at the closings, which further demonstrated his knowledge of the transactions.

And while neither of the closing officers could recall the specific closing, the interactions of the parties, or the individuals present on those days, their testimony about standard practices sufficiently established that Machado was not ignorant of the documents he signed. Both closing officers indicated that their company policies dictated a thorough review of the documents and that they would not have proceeded with a non-English borrower absent some method of translation. This testimony was sufficient for a jury to infer that Machado understood what he was signing and knowingly participated in the scheme to defraud the lenders. As even stronger evidence, Machado's wife, Kelma, who did speak English, was present at the closing for at least Property 2 and was a party to that transaction. As such, she

had an interest in ensuring that Machado understood the transaction and the documents along with her.

As to profits from the scheme, Machado purchased over $700,000 in property and debt financed nearly the entire amount. Machado's profit is also circumstantial evidence of his intent. Even without a line-by-line translation of each document, no reasonable person could have looked at such significant dollar amounts and failed to understand the gravity of these transactions, their questionable financing, or their inconsistency with one's lifestyle and means. Moreover, the lending disclosures signed by Machado at each closing demonstrated to Machado that, despite his true monthly salary of $3,000, he was taking on over $5,000 in monthly mortgage payments for all three loans.

Accordingly, we conclude that sufficient evidence supported Machado's culpable knowledge and intent to commit wire fraud and thus we sustain his convictions.

## VI.    EXCLUSION OF EVIDENCE

### A.    Monteiro's Indictment

During trial in 2016, Machado sought to introduce a 2009 federal indictment that charged Fabricio Monteiro, the agent at Transatlantic, with four counts of providing false information in connection with personal mortgage applications during 2006. Machado argued that the district court should take judicial notice of

Monteiro's indictment and allow Machado to introduce evidence of the indictment to show that Machado was not aware of the misrepresentations in his loan applications and that Monteiro lied to and otherwise misled Machado. The government objected, arguing that Monteiro's offense conduct in the indictment did not concern mortgages Monteiro obtained on behalf of Machado, it did not show any involvement in a conspiracy with Machado, and it did not represent a conviction or mortgage fraud related to Machado.

The district court provisionally excluded the indictment as to relevance and noted: (1) Monteiro was not listed as a witness, codefendant, or co-conspirator; (2) the acts for which Monteiro was indicted occurred after the instant offense conduct; and (3) Monteiro's case shared no financial institutions in common with Machado's. The district court also found that the charged misrepresentations against Monteiro were factually distinct from those in Machado's case. When Machado's counsel argued that the exclusion of this evidence violated Machado's rights to due process, confrontation, and to present a complete defense, the district court responded:

> Mr. Machado has every right to a defense and every right to, as you put it, quote, some other dude did it, but at this point there's no link between any communications or any talk or anything that was done between Mr. Machado and Mr. Monteiro and Mr. Monteiro's indictment in this case. I agree with you and the indictment can come in. It's not an issue of is it admissible because it's a business record or something like that. It's admissible, I understand that, but it's not admissible if it's not relevant in this case, and right now there is no

25

evidence to assert that this indictment is relevant in this case. I have indicated to you if at some point it appears that the indictment may be relevant, I will revisit the situation, but at this point it does not come in as a relevant document.

The indictment was never admitted.

At the close of the government's case, Machado moved for a mistrial based on the exclusion of the indictment offered by the defense, and the district court denied the motion.[13]

## B.    Right to Present a Complete Defense

On appeal, Machado argues that his ability to present a complete defense was severely hindered by the district court's exclusion of Monteiro's indictment.[14]

Implicit in a criminal defendant's constitutional rights under the Fifth and Sixth Amendments is the right to present evidence in his or her favor. See United States v. Hurn, 368 F.3d 1359, 1362 (11th Cir. 2004). Subject to the standard rules of evidence, a district court's decision to exclude favorable evidence offered by the defendant may violate a defendant's rights if the evidence falls under one of these

---

[13]At trial, Machado also sought to introduce Transatlantic documents seized by the government from a third-party server and later argued that their exclusion warranted a new trial. Yet, Machado's appellate brief raises as error only the exclusion of Monteiro's indictment. There is no evidence in the record in Machado's case of what happened to Monteiro's indictment.

[14]We review the evidentiary rulings of the district court for clear abuse of discretion. United States v. Tinoco, 304 F.3d 1088, 1119 (11th Cir. 2002). Even if we determine that an abuse occurred, we will overturn an evidentiary ruling only if it resulted in a substantial prejudicial effect. United States v. Breitweiser, 357 F.3d 1249, 1254 (11th Cir. 2004). When an evidentiary ruling implicates a constitutional question, we review those legal questions de novo. United States v. Underwood, 446 F.3d 1340, 1345 (11th Cir. 2006).

categories: (1) evidence directly pertaining to any of the elements of the charged offense or an affirmative defense; (2) evidence pertaining to collateral matters that, through a reasonable chain of inference, could make the existence of one or more of the elements of the charged offense or an affirmative defense more or less certain; (3) evidence that could have a substantial impact on the credibility of an important government witness; and (4) evidence that tends to place the story presented by the prosecution in a significantly different light, such that a reasonable jury might receive it differently.  Id. at 1363 & n.2; see Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 653 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.").  Even when one of the four circumstances listed in Hurn is present, "otherwise relevant evidence may sometimes validly be excluded under the [Federal] Rules of Evidence."  See Hurn, 368 F.3d at 1363 n.2.

If a district court erroneously excludes one of these forms of evidence and a defendant's right to present evidence was actually violated, we must then assess whether this error was "harmless beyond a reasonable doubt."  Id. at 1362–63. Yet, a district court may exclude defense-favoring evidence where it "does not bear a logical relationship" to an element of the offense or affirmative defense, or where the relationship between the two is simply "too attenuated."  Id. at 1365–66.  This

Court has emphasized that "there comes a point—and a district court is perhaps in the best position to judge this—when the chain of inferences linking evidence and the legally relevant point to be proven is simply too long, dubious, or attenuated to require that the evidence be introduced." Id. at 1366.

To be admissible, evidence must be relevant and not otherwise excluded by the rules of evidence. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence" and "(b) the fact is of consequence in determining the action." Fed. R. Evid. 401. However, a district court may still exclude relevant evidence if "its probative value is substantially outweighed by [the] danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

In this case, the district court excluded Monteiro's indictment on relevance grounds. In doing so, it aptly pointed out that Monteiro was not a witness, codefendant, or co-conspirator in this case; that the fraud for which Monteiro was indicted concerned separate loans that Monteiro sought for himself, and not in his role as a mortgage broker; and that Monteiro did not commit the fraud on his personal loans until over six months after Machado's loan transactions were completed.

On appeal, Machado contends that Monteiro's indictment fits within the second category of favorable evidence—namely, a collateral matter that, through a chain of inferences, tends to make one or more elements of a claim or defense more or less certain. At trial, Machado offered Monteiro's indictment as evidence that Machado was not aware of the misrepresentations contained in his loan documents, especially the loan applications. Machado argues the evidence of Monteiro's alleged participation in similar crimes made Monteiro's culpability in the instant offense more probable and made Machado's participation less probable.

The district court, however, correctly concluded that Monteiro's indictment was not relevant, and there was no link between Monteiro's charged crime and Machado's. As this Court has recognized, it is within the district court's discretion to determine when the chain of evidentiary inferences is "too long, dubious, or attenuated." Hurn, 368 F.3d at 1366. The charges against Monteiro in the indictment did not concern the same transaction, the same parties, or even Monteiro's capacity as an agent or employee of Transatlantic. In fact, the indictment charged that Monteiro had falsely represented that he was employed by V.N.W. Services, Corp. There is no logical link between the charged fraud of Monteiro and the fraud in this case, other than that they both concern mortgage loans. Indeed, whether Monteiro made false representations on his own loan applications has no bearing on whether Machado was aware of the

29

misrepresentations contained in Machado's separate applications. Simply put, Monteiro's indictment was not relevant.

In any event, the evidence proffered for this link was merely an untried indictment, which is not dispositive, or even evidence, of what conduct Monteiro actually committed. To somehow connect Monteiro's indictment to Machado's loans, defense counsel would have had to argue that Monteiro's indictment is evidence of guilt and fraud by Monteiro, which would have been contrary to the district court's instruction that the indictment against Machado was not itself evidence of guilt. Thus, even if the Monteiro indictment had relevance here, it also had a strong potential to confuse the jury. In any event, even without the Monteiro indictment, Machado was still able to point to Monteiro, refer to testimony that mortgage brokers typically complete their clients' loan applications, and point out that Machado's signature on some application-related documents appeared different than his verified signature on the closing documents.

The district court did not abuse its discretion by excluding Monteiro's indictment because it was too attenuated from the legally relevant point of Machado's intent and it had a strong potential to confuse the jury. Because Machado's right to introduce evidence in his defense was not violated, we need not examine whether any error was harmless beyond a reasonable doubt.

## VII.   RIGHT TO ALLOCUTION

Lastly, Machado argues that the district court plainly erred when it failed to afford him the right to allocution before imposing a sentence.  The government concedes plain error on this issue, and we agree.[15]

The right to allocution is "firmly entrenched in our criminal jurisprudence." United States v. Perez, 661 F.3d 568, 584 (11th Cir. 2011).  It provides a defendant the opportunity to plead personally with the district court for leniency in sentencing and to state any potentially mitigating factors for consideration.  Id. at 583.  Federal Rule of Criminal Procedure 32(i)(4)(A)(ii) codified this right by requiring the district court, before imposing sentence, to "address the defendant personally . . . to permit the defendant to speak or present any information to mitigate the sentence."  Fed. R. Crim. P. 32(i)(4)(A)(ii) (emphasis added).  Where the possibility of a lower sentence exists, we presume prejudice from the denial of the defendant's right to allocution.  Perez, 661 F.3d at 586; United States v. Carruth, 528 F.3d 845, 847 n.4 (11th Cir. 2008); see United States v. Doyle, 857 F.3d 1115, 1121 (11th Cir. 2017) (noting general presumption of prejudice when

---

[15]Machado did not raise an objection at the sentencing hearing.  When a party does not timely object to a district court's ruling, we review only for plain error.  United States v. Perez, 661 F.3d 568, 583 (11th Cir. 2011).  To find a reversible error under the plain error standard, we must conclude that: (1) an error occurred; (2) it was plain; (3) it affected substantial rights in that it was prejudicial; and (4) it affected the fairness, integrity, or public reputation of the judicial proceedings.  Id.

the district court fails to afford the right to allocution, "even if [the defendant] received a sentence at the low end of his advisory guidelines range")

In Perez, this Court held that the district court committed plain error by directing the question, "will the defendant be allocuting?" to the defendant's attorney rather than to the defendant. See 661 F.3d at 584. After conferring with the defendant, defense counsel stated that the defendant did not wish to address the court. Id. We reasoned that the district court's question and its direction to defense counsel did not demonstrate clearly and convincingly that the defendant knew he had the right to speak on any subject of his choosing prior to the imposition of sentence. Id. at 585. We also determined that the error affected the defendant's substantial right because he could have received a lower sentence. Id. at 585–86.

In this case, the district court's failure to address Machado personally about his right to allocution constitutes plain error. The district court asked counsel, "Does Mr. Machado wish to make a statement at this time?" Without addressing Machado on the record, defense counsel responded, "No, Your Honor." While we recognize the difficulties of communicating through an interpreter, this does not lessen or change the defendant's right to allocution.

Machado was not afforded his right to allocution. Because Machado was also not sentenced at the low end of his advisory guidelines range, we presume

prejudice.  Perez, 661 F.3d at 586.  And, where the defendant shows prejudice, we also presume satisfaction of the fourth element of the plain-error standard.  Doyle, 857 F.3d at 1118.  Thus, we vacate Machado's sentence and remand for allocution and resentencing.

## VIII.  CONCLUSION

In summary, we affirm Machado's three convictions but vacate his sentence and remand for resentencing consistent with this opinion.

**CONVICTIONS AFFIRMED; SENTENCE VACATED AND REMANDED**.