[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-15149
Non-Argument Calendar

_____

D.C. Docket No. 6:18-cr-00109-GAP-LRH-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHRISTOPHER C. COBURN,

Defendant-Appellant.


_____

No. 20-10758
Non-Argument Calendar

_____

D.C. Docket No.  6:18-cr-00109-GAP-LRH-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHRISTOPHER C. COBURN,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(March 31, 2021)

Before NEWSOM, GRANT, and ANDERSON, Circuit Judges.

PER CURIAM:

When Sandra Arce's home was going into foreclosure, Christopher Coburn told her not to worry—he'd "take care of everything."  He told Jose Rivera something similar, promising that there was something he could try to save his home.  Neither Arce nor Rivera knew what Coburn was up to, but they paid him hundreds of dollars and hoped he'd make their foreclosures disappear.  For a short time, it worked.  But Arce and Rivera later learned that it was only because Coburn had forged their signatures and filed skeletal bankruptcy petitions in their names, temporarily pausing their foreclosures.  The federal government soon caught on and charged Coburn with five counts of filing false bankruptcy petitions, in violation of 18 U.S.C. §§ 157(1) and 2, and two counts of falsifying records in bankruptcy proceedings, in violation of 18 U.S.C. §§ 1519 and 2.  He went to trial and was convicted on all counts.

Coburn now appeals those convictions on three grounds.  First, he raises a *Batson* challenge, claiming that the district court impermissibly allowed the

government to strike a juror during voir dire because of her race. Second, he argues that the district court erred in denying his motion for a judgment of acquittal and his motion for a new trial because the government's case rested on circumstantial evidence that did not sufficiently support his convictions. Finally, he claims that the district court wrongly denied his motion for a new trial because the government committed *Brady* and *Giglio* violations by failing to disclose a plea agreement in a related case. We find no error in any of the district court's decisions on these issues. We therefore affirm.

I.

Christopher Coburn built a business around delaying foreclosure sales. He targeted homeowners who were in foreclosure and promised, for a fee, to buy them "extra time to stay in their homes." Two of those clients were Sandra Arce and Jose Rivera.

Arce first met Coburn in 2013. At that time, she had quit her job and was caring for her ailing mother. While focusing on her mother's health, Arce had fallen behind on her mortgage payments and she was headed towards foreclosure. That's when Coburn showed up at her house. He promised that he would help and told her "not to worry about anything, that the house will not go into foreclosure." They didn't get into details—he told her, "Let me handle it." So she "took his word for it," wrote a $700 check, and waited.

3

Two days later, Arce purportedly served a request for discovery and production of documents in her foreclosure action on the Bank of New York. Importantly, the court had already entered its final judgment in that action. But, as a government witness explained, "after a judgment has been entered, a request for discovery" usually can "delay the foreclosure proceedings because the court may want to take that up" rather than schedule the foreclosure sale. Though the request for discovery was filed in Arce's name, she testified that she did not prepare, sign, or authorize the filing.

Then on May 28, 2013, just two days before the scheduled foreclosure sale on Arce's home, a voluntary bankruptcy petition was filed in her name in the Bankruptcy Court for the Middle District of Florida. A signature bearing her name appeared on the petition, though she later testified that it was not her signature and that Coburn never brought her anything to sign. The bankruptcy petition triggered an automatic stay of the foreclosure sale.

The petition, though, was only a skeletal one—lacking essential information such as a list of assets, statement of financial affairs, and her social security number. So the bankruptcy court dismissed the case on June 12, 2013.

The state then rescheduled Arce's foreclosure sale for September 19, 2013. But, conveniently, one day before the sale, another bankruptcy petition was filed in Arce's name. She testified at trial that, as before, she neither signed that petition

4

nor authorized anyone else to file or sign it.  This petition, like the earlier one, prevented the foreclosure sale from going forward—at least for a while.  But because the petition was another skeletal filing, the bankruptcy court dismissed it days later and the state rescheduled the foreclosure sale for December 3, 2013.

On December 3, though, Arce wrote another check to Coburn for $400, and another voluntary bankruptcy petition was filed in her name—again staying the foreclosure sale.  That same day, an application to waive the bankruptcy court filing fee was filed in Arce's name.  Part of that application asked whether she had previously filed for bankruptcy relief during the past eight years, since the bankruptcy court may choose not to waive the fee for a serial filer.  The answer was "checked as a no," when in fact it was her fourth purported filing that year.  The foreclosure sale was again rescheduled, this time for April 1, 2014.

On April 1, the sale finally occurred as planned.  That same day, another bankruptcy petition was filed again in Arce's name.  This time, though, it had no effect on the foreclosure because the sale had already gone through.

\*        \*        \*

Jose Rivera met Coburn in the middle of a rough year.  He was going through a divorce and had lost his home in a foreclosure.  But when he was speaking with his title company, someone told him that there was "this guy that was helping a lot of people" keep their homes out of foreclosure: Christopher

Coburn. So Rivera contacted him to see if he could help him "win back the house." Coburn told him that there "was something that we could do," like an "objection to sale" or "some kind of motion that we could file" that might "win back" his home. Rivera bought into the idea and paid Coburn's $500 fee.

Later that afternoon, a bankruptcy petition was filed in Rivera's name in the Bankruptcy Court for the Middle District of Florida. That petition—like Arce's—was skeletal. The moment the bankruptcy petition was filed, Fannie Mae's foreclosure action against Rivera was stayed.

Accompanying the petition was an application to have the filing fee waived. But that application was riddled with misinformation. For instance, the application stated that Rivera could not pay the filing fee because he had "no money," which he explained at trial was not true. The application also included false information about Rivera's monthly expenses, cash flow, and his bank accounts.

Rivera had no idea that the bankruptcy petition or application were filed. Though his name was signed to both documents, he testified that it was not his signature and that he did not authorize Coburn to submit the filings for him.

*    *    *

In 2018, Coburn was indicted for bankruptcy fraud and for falsification of records in bankruptcy based on the petitions he filed for Arce and Rivera. Coburn elected to go to trial on these charges and was convicted. The court denied his

motion for acquittal and his renewed motion for acquittal based on the sufficiency of the evidence. It also denied Coburn's motion for a new trial based on the weight of the evidence and an alleged *Brady/Giglio* violation. Coburn was sentenced to probation for three years.

## II.

We review for clear error the district court's finding that the government exercised a peremptory strike free of discriminatory intent. *United States v. Houston*, 456 F.3d 1328, 1334 (11th Cir. 2006). We consider de novo whether the evidence was sufficient to sustain a criminal conviction, viewing the facts and drawing all reasonable inferences in the light most favorable to the government. *United States v. Davis*, 854 F.3d 1276, 1292 (11th Cir. 2017). Finally, the district court's denial of a motion for a new trial is reviewed for abuse of discretion. *United States v. Stein*, 846 F.3d 1135, 1145 (11th Cir. 2017).

## III.

Coburn argues that errors occurred before, during, and after his trial. First, he claims that before trial, the district court wrongly overruled his *Batson* objection, allowing the government to strike a juror out of racial animus. Second, he argues that the government failed to present adequate evidence at trial to support his convictions. Finally, he suggests that he is entitled to a new trial because he discovered after trial that the government failed to disclose a plea

agreement in a related case, constituting a *Brady* or *Giglio* violation.  We take each argument in turn.

A.

First, Coburn insists that the district court committed reversible error by allowing the government to strike a juror on the basis of race.  During voir dire, the government used its fifth peremptory strike on Rianne Lyew, whom the defense counsel said appeared to be "black and Asian."  Coburn's attorney asked the government to state a "racially neutral reason" for the strike; he added that it was "a close call" and stated that he was not "suggesting that the Government has an inappropriate motive."  The prosecutor replied that there was "no racial basis at all in the Government's mind."  He "just didn't feel she would be a juror in [the government's] favor."  The court overruled the defense's objection, finding that there was "no appearance here that the Government [was] using its strikes based on race, none whatsoever."

The government ordinarily is entitled to exercise peremptory challenges for any reason at all.  *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).  But the Equal Protection Clause prevents the government from striking potential jurors based on their race.  *Id.*  In *Batson*, the Supreme Court established a "burden-shifting approach that allows a trial court to determine whether peremptory strikes were the result of racial animus."  *United States v. Houston*, 456 F.3d 1328, 1335 (11th Cir.

8

2006). First, the defendant must establish a *prima facie* case of discriminatory intent. *Batson*, 476 U.S. at 93–94. If discriminatory intent is established, the government must provide a race-neutral explanation for exercising its peremptory strike—the prosecutor cannot "rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirming his good faith in making individual selections.'" *Id.* at 94, 98 (quoting *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972)) (alterations adopted). Then the court must evaluate the credibility of the stated justifications based on the evidence placed before it. *Houston*, 456 F.3d at 1335.

Sometimes, as happened here, that first step gets skipped. If the court asks the government for a race-neutral reason before the defendant establishes a *prima facie* case of discrimination, then that first step is moot. *Id.* at 1335–36. But that doesn't relieve the defendant of his burden to ultimately prove discrimination—that remains at all times. *Id.* at 1336.

Coburn failed to carry that burden when he raised his objection before the district court and he cannot remedy that deficiency now on appeal. His attorney, in fact, presented *no* evidence to the district court that the government struck Lyew for racial reasons. He simply noted that Lyew "appears to be black and Asian" and wondered aloud if there "may be some racial component" to the government's strike. Striking a juror of a particular race, though, does not automatically create

9

an inference of racial discrimination. *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1044 (11th Cir. 2005). The defendant "must point to more than the bare fact of the removal of certain venirepersons and the absence of an obvious valid reason for the removal" and "must identify facts and circumstances that support the inference of discrimination." *United States v. Allison*, 908 F.2d 1531, 1538 (11th Cir. 1990) (quotation omitted). No such facts were presented here, either at the time of the objection or after the government stated its proffered reason. All that Coburn said was that the juror was "clearly mixed race." And, in fact, contrary to his burden of proof for a *Batson* objection, Coburn's attorney explicitly stated that he was "not suggesting that the Government [had] an inappropriate motive."

Now on appeal, Coburn finally provides an argument for why the government's strike was discriminatory. He claims that the government's peremptory strikes demonstrated a pattern of discrimination because the prosecutor struck three other minority jurors before striking Lyew. But Coburn never "brought this fact to the attention of the court, even though the court gave him ample opportunity to do so." *Houston*, 456 F.3d at 1338. And because of that, we have no record evidence showing what the other jurors' races were or why the government struck those jurors. Generally, we "do not address on appeal arguments not clearly presented to the district court." *Id.* And we decline to do so now. Because Coburn failed to make any case of purposeful racial discrimination

before the district court—either *prima facie* or on the third *Batson* step—we find no clear error in the court's decision to overrule the objection.[1]

B.

Next, Coburn suggests that the government presented insufficient evidence to convict him of all charges. To be sure, there was evidence that *someone* filed fictitious bankruptcy petitions in Arce and Rivera's names. But, he insists, the government's witnesses "did not indicate any knowledge of who had signed the homeowner's names upon, or who had filed the application forms and fee waiver forms in the bankruptcy court"—only "circumstantial evidence was presented to the jury."

When reviewing the sufficiency of the evidence, our only question is whether a "reasonable trier of fact *could* conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt." *United States v. Rodriguez*, 218 F.3d 1243, 1244 (11th Cir. 2000) (emphasis added). And here, we conclude that one could.

Coburn's main argument seems to be that the jury found him guilty based only on circumstantial evidence. But circumstantial evidence "is not intrinsically

---

[1] We note that, as Coburn argues, the government's explanation for dismissing Lyew may have been too vague. *See United States v. Horsley*, 864 F.2d 1543, 1546 (11th Cir. 1989). But ultimately, Coburn bore the burden of showing purposeful discrimination. Merely stating that the government's reason was vague is not enough to carry that burden.

less valuable or less reliable than direct evidence." *United States v. Register*, 182 F.3d 820, 830 (11th Cir. 1999). Here, there was ample direct and circumstantial evidence to cause a jury to reasonably infer that Coburn filed Arce and Rivera's bankruptcy petitions or, at the very least, caused them to be filed.[2]

For instance, Arce and Rivera testified that they hired Coburn to help them with their foreclosure proceedings but did not authorize him to file bankruptcy petitions for them. Still, the government produced testimony that four unauthorized bankruptcy petitions were filed in Arce's name and one in Rivera's name. Next, there was an uncanny correlation between the dates of the bankruptcy filings and the dates Arce and Rivera issued checks to Coburn. Arce wrote a $700 check to Coburn on March 10, 2013. Two days later, her foreclosure was delayed when a request for discovery and production of documents was filed in her state court foreclosure action. She wrote another $400 check on December 3, 2013. That same day, a bankruptcy petition was filed in her name. Same story with Rivera. On August 13, 2014, Rivera issued a $500 check to Coburn. Later that same day, a bankruptcy petition was filed in his name.

There was also a strong correlation between the dates of the foreclosure sales and the dates of the bankruptcy filings—with the petitions often being filed

---

[2] The indictment charged an aiding-and-abetting theory as well. So even if Coburn did not personally sign or file the bankruptcy petitions and fee-waiver applications, but *caused* them to be filed, his offense would be "punishable as a principal." *See* 18 U.S.C. § 2.

the day before or the day of a scheduled foreclosure sale, delaying the foreclosure. Finally, one of Coburn's associates, Michaelangelo Hijada, testified for the government that he accompanied Coburn to court to file bankruptcy petitions in debtors' names to delay their foreclosure sales. He just didn't say whether Arce and Rivera's petitions were among the ones he saw filed.

So, true—no one testified that they personally saw Coburn sign Arce and Rivera's names to the petitions, walk to the courthouse, and file the documents. But strong circumstantial evidence allowed a reasonable jury to infer that Coburn accepted payment from unwitting clients and then filed skeletal, falsified bankruptcy petitions to delay foreclosure sales for his clients.

Coburn also argues that the government's evidence was insufficient to support the intent elements for all his convictions. To establish bankruptcy fraud, the government needed to show that Coburn had the intent to "devise a scheme or artifice to defraud." 18 U.S.C. § 157. And to convict him of falsifying records in bankruptcy proceedings, it needed to prove that he knowingly falsified bankruptcy records with the "intent to impede, obstruct, or influence" a bankruptcy proceeding. *Id.* § 1519.

A jury may "infer the 'intent to defraud' from the defendant's conduct and circumstantial evidence." *See United States v. Machado*, 886 F.3d 1070, 1083 (11th Cir. 2018). And evidence that "the defendant profited from a fraud may also

13

provide circumstantial evidence of the intent to participate in that fraud." *Id*.

Here, both Coburn's conduct and profit suggest that he intended to participate in

the scheme to defraud.  For instance, the government submitted evidence that

Coburn and Hijada used a script to lure vulnerable clients to hire them to delay

foreclosures.  The bottom of the script explained the plan: "It's all a song and

dance that will eventually lead to the end goal, which is a suggestion of BK," i.e.,

bankruptcy.  Coburn also told Hijada that he was filing petitions for bankruptcy so

that he could buy his clients "extra time to stay in their homes."  And if this wasn't

enough, there was sufficient evidence to show that Coburn profited from filing the

false bankruptcy petitions—charging Arce a total of $1,100, and Rivera $500, for

his "assistance."  A reasonable jury could rely on all this evidence to infer that

Coburn had the requisite intent to defraud.

The same can be said for Coburn's conviction for falsifying records.

Circumstantial evidence also supports the jury's conclusion that Coburn had the

intent required under § 1519 to obstruct or impede a bankruptcy proceeding.

*United States v. Hunt*, 526 F.3d 739, 745 (11th Cir. 2008).  The fee-waiver

applications falsely stated that Arce had not filed for bankruptcy any time in the

last four years, even though Coburn appeared to have filed *multiple* petitions in her

name in a matter of months.  The government also offered testimony that the

bankruptcy court considers how often a debtor has filed for bankruptcy when

14

deciding whether to waive the fee.  A reasonable jury could have inferred from this that Coburn intended to omit Arce's earlier filings in order to increase the chances that the fee waiver would be granted.

Based on the strong testimony and circumstantial evidence offered by the government at trial, we conclude that there was a reasonable basis for all of the jury's verdicts.

C.

Finally, Coburn suggests that he was entitled to a new trial because the government failed to disclose a plea agreement for Milton Sicard.  Hijada, a government witnesses, worked with Coburn to file falsified bankruptcy petitions and to conduct short sales of foreclosed homes.  Hijada pleaded guilty to one count of bankruptcy fraud.  One of his associates, Milton Sicard, also entered a guilty plea in a short sale and bankruptcy fraud scheme.  After the jury had retired, the district court judge came across Sicard's guilty plea and asked Coburn's counsel if he was aware of it, since some of the facts appeared to overlap with Coburn's case.  Coburn's counsel said he was unaware of the plea agreement and suggested that knowing about it may have "significantly affected" his cross-examination of Hijada and his trial preparation.  Once the jury returned its verdict, Coburn moved for a new trial based on the government's failure to disclose the plea agreement.  His entire argument on this point was contained in one sentence: "Here, the failure

of the government to furnish to the defendant the plea agreement of Mr. Hijada's co-worker, Milton Sicard, or even identify the pendency of that proceeding, substantially impaired Mr. Coburn's rights as guaranteed under the Sixth and Fourteenth Amendments to the Constitution and invariably affected the jury's verdicts."

The district court noted that Coburn failed to explain how the government's failure to disclose the plea "violated his rights, or how the theory of defense or preparation for trial would have been any different had defense counsel been informed of *Sicard*." It also said that Coburn's attorney "knew about Hijada's involvement in the scheme, and it is not apparent how the knowledge of Sicard's plea agreement would have benefited the defense." The court refused to grant Coburn a new trial based simply on his "bare conclusion of prejudice" and summary assertion that "failure to disclose the Sicard plea agreement rises to the level of a constitutional violation."

We agree. In some cases, the government's failure to disclose evidence to the defense rises to the level of a constitutional violation. A *Brady* violation occurs when the defendant shows that "(1) the government possessed favorable evidence to the defendant; (2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant,

16

there is a reasonable probability that the outcome would have been different."
*Stein*, 846 F.3d at 1146 (quotation omitted). A *Giglio* error, which is "a species of *Brady* error," occurs when "the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury." *Id.* at 1147. In this case, Coburn has fallen far short of establishing a violation under either *Brady* or *Giglio*.

First, though we normally review these alleged errors de novo, we doubt Coburn adequately preserved this issue for review, since his motion for a new trial did not "precisely articulate a *Brady* violation" but only vaguely referenced the constitutional violation and prejudice. *See United States v. Kersey*, 130 F.3d 1463, 1465 (11th Cir. 1997) (if the defendant "did not precisely articulate a *Brady* violation in his or her motion for new trial, this court need only conduct a plain error review"). But under either de novo or plain error review, Coburn hasn't carried his burden of showing a *Brady/Giglio* violation.

Coburn's brief focuses only on how the defense may have used facts from Sicard's plea agreement to impeach Hijada. He makes no effort to explain how the defense could "not obtain the evidence"—a court record—"with any reasonable diligence." *Stein*, 846 F.3d at 1146 (quotation omitted). Nor does he convincingly explain how Sicard's plea agreement would have been favorable to him. He suggests that the plea agreement shows that Hijada was involved in filing falsified

17

bankruptcy petitions.  But this adds nothing—Hijada admitted at trial that he helped to file the bankruptcy petitions.  Finally, nothing in his brief alleges that the government used perjured or false testimony, as is required for a *Giglio* claim.  *Id.* at 1147.  Because Coburn failed to establish key elements of his *Brady* and *Giglio* claims, the district court did not err in denying his motion for a new trial.

*    *    *

Coburn's convictions were supported by sufficient evidence and he has not established any constitutional errors before, during, or after trial.  We therefore affirm.

**AFFIRMED.**