[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-10781

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MARK MURPHY,
JENNIFER MURPHY,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 5:20-cr-00291-LSC-SGC-1

_____

Before JORDAN, NEWSOM, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

This criminal appeal involves two codefendants—Dr. Mark Murphy and his wife Jennifer Murphy—who operated a pain management clinic in Alabama. After a jury convicted the Murphys of drug conspiracy and healthcare fraud among other crimes, the Murphys were each sentenced to twenty years in prison. Both challenge their convictions on appeal, arguing among other things that the evidence underlying their convictions was insufficient, that the court gave an erroneous jury instruction on their drug conspiracy charge, and that the court violated their constitutional right to present a defense when it excluded testimony of Dr. Murphy's good care for some of his patients. Separately, Mrs. Murphy argues that the court abused its discretion by denying her motion for a mistrial after a witness provided testimony the court later instructed the jury to disregard. Dr. Murphy also challenges his sentence, arguing that the district court improperly calculated drug weight and loss amount, and that his sentence was substantively unreasonable. We reject all their arguments and affirm.

## I.

### A.

We begin with the facts. Dr. Murphy was a licensed physician specializing in pain management. He and Mrs. Murphy, his business partner, operated a pain management clinic called North Alabama Pain Services. NAPS had two locations in Alabama—one

in Decatur and the other in Madison. Despite the practice's large patient population, Dr. Murphy was the only doctor on staff. Often, though not always, NAPS employed a nurse practitioner or physician's assistant to work as a physician extender. As one extender testified, she and Dr. Murphy would work opposite one another—one would go to Madison one day while the other went to Decatur, and vice versa.

NAPS patients suffered from chronic pain issues. To manage their pain, patients sought prescriptions for opioids, including hydrocodone, oxycodone, fentanyl, and morphine. Doctors testified at trial that opioid use can cause addiction, overdose, and death. Accordingly, only medical providers registered with the Drug Enforcement Administration can prescribe drugs like oxycodone or hydrocodone. To mitigate the risks of opioid use, prescribing physicians conduct risk-benefit analyses. For instance, an expert testified that doctors should consider whether the patient has a history of alcohol or drug dependence. Another physician explained that they should conduct a physical examination of the patient, review medical records, and create a treatment plan. And doctors use prescription monitoring programs to ensure patients are not "doctor shopping" and receiving medications elsewhere. After prescribing opioids, doctors often conduct drug tests; if those tests reveal that a patient failed to take the prescribed medication or is taking other drugs—all possible signs of drug abuse, misuse, or diversion—a doctor "better do something about it," testified one physician. And, an expert acknowledged, patients receiving steadily increasing amounts of medication should have regular office visits, including

with a physician, physician assistant, or nurse practitioner—not only a nurse.

Dr. Murphy's practice was very busy. NAPS patients had an office visit every twenty-eight days to obtain their opioid prescriptions. The Decatur office saw about eighty to one hundred patients a day—and the Madison office, at least another fifty. In total, NAPS scheduled about two thousand patients a month for office visits. The clinics were so full of patients that there "wasn't a seat to be had" in the waiting room, and about twenty patients had to stand or wait outside. Sometimes, when exam rooms were full, a nurse conducted visits in the hallway or kitchen.

NAPS patients followed a standard routine to continue their prescriptions. They took a drug test at each visit. Regardless of the results of the in-house drug test, Dr. Murphy had standing orders that patients also do a comprehensive urine test, which was conducted in the NAPS clinic by an outside lab. Dr. Murphy required this extra test each visit, but insurers told him it should be "reserved for the confirmation of results produced by the simple screen." Also, twice a year, NAPS patients underwent a nerve conduction test by a company called QBR. QBR paid the Murphys $120 for every test that insurance covered. And that was often—QBR did more tests for Dr. Murphy than for any other doctor. QBR benefited too by using the highest-paying billing code, which required testing thirteen or more nerves. Patients complained about these painful tests, which Dr. Murphy often did not discuss with them. But to get their prescriptions, many patients had to complete these

tests. And even though insurers did not allow standing orders for services like the urine and nerve tests, NAPS continued to issue such orders.

On top of the tests, NAPS also doled out unnecessary and expensive braces and medicated pain creams. Those prescriptions were funneled through the urine collectors who, though employed by an outside lab, did the Murphys' bidding and at times provided them with free labor. While the urine collectors obtained the urine samples, they routinely told patients that the patients needed these products and then filled out prescription orders pre-signed by Dr. Murphy. Mrs. Murphy told the collectors and patients that Dr. Murphy wanted patients to get those products in addition to their opioids. The Murphys even gave the collectors stamped or pre-signed prescription orders with four or five different signatures so that the photocopying and pre-signing was not too obvious. The collectors sent updated prescriptions for patients every month, whiting out and changing the date before sending in the same form, regardless of whether the patient visited on the new date. So those expensive creams came every month until patients contacted the pharmacy to stop—which they regularly had to do. Some patients told the pharmacies that they had not seen Dr. Murphy in years. Others received creams even after they died.

There was a reason the Murphys significantly over-prescribed braces and creams—money. Pharmaceutical sales representatives for those products paid the urine collectors a commission for each prescription the collectors sent in. Mrs. Murphy told

the sales representatives which collectors to pay and how much. And two of the collectors whom she told the representatives to pay were her son and brother-in-law. As Dr. Murphy admitted on the stand, sales representatives seeking his business had paid his family members.

Patients could go long stretches of time without seeing Dr. Murphy because of the sheer volume of patients and because Dr. Murphy went to only one clinic a day. And because he often did not see patients at their visits, Mrs. Murphy would bring home a stack of unsigned prescriptions for Dr. Murphy to pre-sign—and he signed them days or even weeks in advance of patient appointments. For instance, Dr. Murphy signed a prescription for an August visit even though the patient did not attend that month's visit—he had died in July. Some patients complained about not seeing the doctor, and "even if they did see him, they didn't have time to discuss whatever concerns because it was so quick." Per Dr. Murphy's instructions, nurses began doing a process they dubbed a "wave by." As one nurse testified: "A wave by is when there is not enough time to actually see the patient. You were to bring them by the room Dr. Murphy was in so he could wave at them." Dr. Murphy also told his staff to use his billing code as a default, even when he did not see the patient, on the theory that he had reviewed patient charts in advance. Insurance companies do not allow that practice, witnesses testified—nurse or extender visits use a different billing number at a lower rate. Even when Dr. Murphy was not physically present, patient records included a boilerplate

statement that he was available but the "patient decline[d]" to see him.

Dr. Murphy ignored many patients' red flags. Physicians who reviewed patients' medical files testified that he ignored signs of abuse. For example, there were indicators that some patients were abusing or selling their drugs. One patient testified that he had flagged his prior alcohol abuse on his intake form, but Dr. Murphy never explained the dangers of mixing opioids and alcohol. The patient admitted he was addicted to opioids while he was a NAPS patient for several years, only overcoming that addiction after the clinic closed. Nurses or physician assistants tried to release patients for repeatedly failing drug tests but were overruled by the Murphys. The Murphys refused to release one patient who failed drug tests because they had invested in the patient's patent and believed, as one witness stated, that the patent would "get them rich." At least one nurse left NAPS— for lower-paying employment— due to the quantity of opioids that NAPS was prescribing.

Dr. Murphy was NAPS's sole doctor, but Mrs. Murphy managed its day-to-day operations. She had "[a]ll the authority" and "pretty much ran all aspects of the office," one witness stated. Witnesses further testified to aspects of her leadership, including that it involved "a lot of yelling" and "[a] lot of intimidation." She screamed at nurses and patients and would yell at a nurse to make Dr. Murphy "move faster." She referred to herself as the "bitch that ran the office." She made urine collectors clean the bathroom as "punishment." On top of her poor management, Mrs. Murphy

adopted concerning business practices. She stuffed cash copays into her purse. She asked an employee to deposit copay cash at Wells Fargo, where she held her personal accounts—and as bank records revealed, those accounts saw regular cash deposits totaling hundreds of thousands of dollars. She asked a urine collector to put copay cash in a hidden bag in a bathroom in her house. She told a sales representative that he "couldn't come into the office unless he brought $300 Ruth[']s Chris [Steak House]" gift cards for her "every month." And when she was angry with urine collectors, she would not let sales representatives pay them for the month.

Mrs. Murphy also ran a nonprofit organization, the Crystal Murphy Enrichment Organization. Donations to CMEO funded vacations for the Murphys' friends and family to places like Alaska, Israel, and Spain. As a urine collector testified, Mrs. Murphy gave her thousands in cash and told her to buy cashier's checks payable to CMEO. Mrs. Murphy instructed the collector that if law enforcement asked about the checks, the collector was to say that she bought them with her (instead of Mrs. Murphy's) own money. Sales representatives wishing to do business with the Murphys were also expected to donate large sums to CMEO. Mrs. Murphy would remind the representatives to pay regular donations worth several thousands of dollars a check. Some donations were for amounts as large as $10,000 and $12,000. After the Murphys began to be criminally investigated, Mrs. Murphy asked a sales representative to sign a letter stating that she had not pressured him to donate to CMEO, which he refused to do because he "knew [he] would be lying."

The Murphys' medical practice was massive in scope. Out of more than a million practitioners nationwide, Dr. Murphy was number one in dollars billed to Medicare for lab tests. He billed Medicare tens of millions of dollars for those tests and Blue Cross Blue Shield nearly $40 million for services referred to two labs. He billed insurers over a million dollars for braces and over ten million for nerve tests. For drugs he prescribed, insurers were billed more than $160 million. As for the office visits, he billed insurers millions of dollars under his code, even for visits when he did not see the patient.

### B.

A federal grand jury indicted the Murphys, along with four codefendants. Two codefendants—the ones involved in the lab tests and brace and cream fraud—pleaded guilty to healthcare fraud conspiracy. Dr. Murphy and Mrs. Murphy, along with their son and Dr. Murphy's brother (again, two of the urine collectors), proceeded to trial. After an eight-day trial, the jury convicted Dr. Murphy and Mrs. Murphy and acquitted the son and brother.

Dr. Murphy and Mrs. Murphy were convicted on the following charges: conspiring to unlawfully distribute fentanyl, oxycodone, and hydrocodone, in violation of 21 U.S.C. § 846 (Count 1); conspiring to commit healthcare fraud, in violation of 18 U.S.C. § 1349 (Count 5); five counts of healthcare fraud, in violation of 18 U.S.C. § 1347 (Counts 6 to 10); conspiring to defraud the United States by soliciting and receiving kickbacks, in violation of 18 U.S.C. § 371 (Count 11); and soliciting or receiving kickbacks

involving a federal healthcare program, in violation of 42 U.S.C. § 1320a-7b(b)(1) and 18 U.S.C. § 2 (Count 22). Dr. Murphy was also convicted of a drug distribution offense, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C) and 18 U.S.C. § 2 (Count 3), and Mrs. Murphy was convicted of three counts of providing a false statement to the Internal Revenue Service, in violation of 26 U.S.C. § 7206(1) (Counts 23 to 25).

After being denied judgments of acquittal at trial, the Murphys filed motions for a new trial. The district court denied those motions too, but vacated Dr. Murphy's substantive drug conviction (Count 3) after our remand decision in *United States v. Ruan*, 56 F.4th 1291 (11th Cir. 2023) ("*Ruan III*").

Stacking the statutory maximums, the district court found that the guidelines ranges were 1,140 months of imprisonment for Dr. Murphy and 1,248 months for Mrs. Murphy. The judge varied downward and sentenced both to 240 months. Though Dr. Murphy objected to his guidelines range at sentencing, challenging the drug quantity and loss calculations, the district court overruled his objections and stated it would have given the same sentence "regardless of how the guidelines issues had been resolved." Both defendants timely appealed.

## II.

The Murphys raise six issues on appeal. First, the Murphys challenge the sufficiency of the evidence for their convictions. Second, they argue that they are entitled to a new trial because the district court gave the wrong jury instruction on the Count 1 drug

conspiracy charge. Third, Mrs. Murphy argues that the district court abused its discretion by denying her motion for a mistrial after her tax return preparer offered testimony that the court later struck and asked the jury to disregard. Fourth, the Murphys argue that they are entitled to a new trial because the district court violated their constitutional right to present a defense when it excluded evidence of Dr. Murphy providing good care to some patients. Fifth, they argue that the court's cumulative error warrants a new trial. Finally, Dr. Murphy argues that his sentence should be vacated because the district court determined drug weight without a reliable basis and erroneously determined intended loss instead of actual loss. We address each issue in turn.

*A.*

We start with the sufficiency of the evidence. We review a challenge to the sufficiency of the evidence *de novo*, construing the evidence, drawing reasonable inferences therefrom, and making credibility choices, all in favor of the jury's verdict. *See United States v. Laines,* 69 F.4th 1221, 1229 (11th Cir. 2023), *cert. denied,* 144 S. Ct. 2611 (2024); *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007). There is sufficient evidence to support a guilty verdict if "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Maurya*, 25 F.4th 829, 841 (11th Cir. 2022) (quotation marks omitted). That test is the same "regardless of whether the evidence is direct or circumstantial, and no distinction is to be made between the weight given to either direct or circumstantial evidence." *United States v. Albury*, 782

F.3d 1285, 1293 (11th Cir. 2015) (quotation marks omitted). Here, we consider each of the challenged convictions, starting with drug conspiracy (Count 1).

1.

The Murphys first contend that the government failed to present sufficient evidence that they conspired together to unlawfully distribute controlled substances. *See* 21 U.S.C. § 846 (conspiracy); *id.* § 841(a)(1) (unlawful drug distribution). To establish a conspiracy to commit a drug-related offense, "the government must prove beyond a reasonable doubt that two or more persons agreed to commit a drug-related offense, that the defendant knew of the conspiracy, and that he agreed to become a member." *United States v. Louis*, 861 F.3d 1330, 1333 (11th Cir. 2017). The Murphys argue that here, there is not enough evidence that "two or more persons agreed" to unlawfully distribute drugs. In their view, even if Dr. Murphy knew his drug prescriptions were unauthorized, the government failed to prove that *Mrs. Murphy* also knew they were unauthorized and facilitated their issuance. And without enough evidence of Mrs. Murphy's knowing participation, they argue, there was not enough evidence of a conspiracy.

The Murphys are mistaken. A defendant's knowing participation in a conspiracy can be proven by circumstantial evidence, "such as acts committed by the defendant which furthered the purpose of the conspiracy." *United States v. Bain*, 736 F.2d 1480, 1485 (11th Cir. 1984). The government need not have proven that the defendant knew "all of the details or participated in every aspect of

the conspiracy." *United States v. Vernon,* 723 F.3d 1234, 1273 (11th Cir. 2013) (quotation marks omitted). Instead, it need only prove that the defendant "knew of the essential nature of the conspiracy." *United States v. Moran*, 778 F.3d 942, 960 (11th Cir. 2015) (quotation marks omitted).

Here, there was sufficient evidence that Mrs. Murphy and Dr. Murphy agreed to—or, put differently, knowingly conspired to—distribute drugs in an unauthorized manner. *See Louis*, 861 F.3d at 1333. Even if the government did not list every specific prescription Mrs. Murphy knew to be unauthorized, evidence amply established that she knew of and facilitated the issuance of unauthorized opioid prescriptions. She was the "billing contact person" for insurance agencies, and Blue Cross Blue Shield repeatedly alerted NAPS about the concerning volume of opioid prescriptions. She brought home stacks of prescriptions for Dr. Murphy to pre-sign. She and Dr. Murphy overruled nurses' attempts to release patients who failed drug tests. A jury could reasonably conclude from this evidence that Mrs. Murphy knowingly helped Dr. Murphy to issue unauthorized drug prescriptions and thus that the two conspired to unlawfully distribute drugs.

2.

The Murphys next challenge the sufficiency of the evidence underlying their convictions for healthcare fraud conspiracy under 18 U.S.C. § 1349 (Count 5); substantive healthcare fraud under 18 U.S.C. § 1347 (Counts 6 to 10); kickback conspiracy under 18 U.S.C.

§ 371 (Count 11); and receiving a kickback, in violation of 42 U.S.C. § 1320a-7b(b)(1) (Count 22).

A person commits healthcare fraud (Counts 6 to 10) if "in connection with the delivery of or payment for health care benefits, items, or services," he "knowingly and willfully" executes a scheme to "defraud any health care benefit program" or to "obtain, by means of false or fraudulent pretenses" any money or property owned by a healthcare benefit program. 18 U.S.C. § 1347(a); *United States v. Grow*, 977 F.3d 1310, 1321 (11th Cir. 2020). Indeed, an element of healthcare fraud is that "the defendant acted willfully and with intent to defraud." *United States v. Scott*, 61 F.4th 855, 864 (11th Cir. 2023). To sustain a conviction for *conspiracy* to commit healthcare fraud (Count 5), the evidence must establish that: (1) the conspiracy existed; (2) the defendant knew of the conspiracy; and (3) he or she knowingly and voluntarily joined it. *See* 18 U.S.C. § 1349; *United States v. Gonzalez*, 834 F.3d 1206, 1214 (11th Cir. 2016).

As for the kickback conviction (Count 22), it is unlawful to "knowingly and willfully" solicit or receive a kickback in return for (1) "referring" an individual to someone "for the furnishing or arranging for the furnishing of any item or service" paid for in part or whole under a federal healthcare program; or in return for (2) "purchasing" or "ordering"—or arranging for or recommending the purchasing or ordering of—any good, service, or item partially or wholly paid for under a federal healthcare program. 42 U.S.C. §§ 1320a-7b(b)(1)(A)–(B). To sustain a conviction for *conspiracy* to receive healthcare kickbacks (Count 11), *see* 18 U.S.C. § 371, the

evidence must establish that (1) a conspiracy existed, and the defendant (2) knew about it and (3) with knowledge, voluntarily joined it. *United States v. Howard*, 28 F.4th 180, 189 (11th Cir. 2022), *cert. denied sub nom. Bramwell v. United States*, 143 S. Ct. 165 (2022).

Dr. Murphy's only sufficiency challenge as to the healthcare fraud and kickback convictions focuses on their *mens rea* element. Specifically, he argues that the government failed to establish his "fraudulent intent" because the evidence was insufficient to prove that he did not act in "good faith." This argument falls flat, regardless of which conviction's *mens rea* element we construe it to challenge. For one, Dr. Murphy cites only his own trial testimony to argue that he acted in good faith, but the jury was "free to disbelieve" his testimony and even "consider it as substantive evidence of [his] guilt." *United States v. Rivera*, 780 F.3d 1084, 1098 (11th Cir. 2015). Second, his self-serving testimony cannot overcome the overwhelming evidence of his criminal intent. As trial testimony supported, Dr. Murphy gave standing orders to do comprehensive urine tests and nerve tests, pre-signed prescriptions as a matter of course, instructed urine collectors to use his pre-signed orders to prescribe unnecessary braces and creams, and directed his staff to use improper billing codes. Insurers were then billed millions for these services and products. And, in exchange for prescribing unnecessary nerve tests, creams, and braces, Dr. Murphy and his family received from QBR or sales representatives hefty commissions or vacation-funding donations to CMEO. A juror could reasonably conclude from this evidence that Dr. Murphy "knowingly and willfully" defrauded a healthcare benefit program and "knowingly and

willfully" received kickbacks. *See* 18 U.S.C. § 1347(a); 42 U.S.C. § 1320a-7b(b)(1). And a juror could reasonably conclude that Dr. Murphy knew of and knowingly joined a conspiracy to commit healthcare fraud and to receive kickbacks. *See* 18 U.S.C. §§ 371, 1349; *Gonzalez*, 834 F.3d at 1214; *Howard*, 28 F.4th at 189.

Mrs. Murphy's sufficiency arguments fare no better. Her appellate briefing gives no explanation for why the evidence for her healthcare fraud and kickback convictions was insufficient. Instead, it merely recites some of the elements those convictions require. So her perfunctory arguments as to these convictions are forfeited. *See Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 899 (11th Cir. 2022) ("An appellant forfeits an issue when she raises it in a perfunctory manner without supporting arguments and authority" (quotation marks omitted)); Fed. R. App. P. 28(a)(8)(A) (arguments in the appellant's brief "must contain . . . appellant's contentions and *the reasons for them*, with citations to the authorities and *parts of the record* on which the appellant relies" (emphasis added)).

3.

Mrs. Murphy also argues that the government failed to present sufficient evidence to convict her of submitting false tax returns (Counts 23 to 25) in violation of 26 U.S.C. § 7206(1).

To sustain a conviction under Section 7206(1), the government must prove four elements: (1) the defendant willfully made and subscribed to a tax return; (2) the return contained or was verified by a written declaration that it was made under penalties of perjury; (3) the defendant did not believe the return to be true as

to every material matter; and (4) the return was false as to a material matter. *See* 26 U.S.C. § 7206(1); *United States v. Clarke*, 562 F.3d 1158, 1163 (11th Cir. 2009). Mrs. Murphy argues that the evidence fell short on each element. She is wrong.

We start with the first and second elements. Sufficient evidence established that Mrs. Murphy (1) willfully made and subscribed to a tax return (2) containing a written declaration that it was made under penalty of perjury. The perjury element is easily satisfied: the Murphys' as-filed tax returns for the 2013 to 2015 tax years each contained an avowal that the return was filed under the penalty of perjury. Mrs. Murphy argues, however, that the evidence did not prove that she "made and subscribed to" those returns because they contained only asterisks in the signature location. But those asterisks do not exonerate her. As an IRS agent testified, taxpayers can use PINs to generate electronic signatures, which then appear on tax returns as asterisks, and can authorize a preparer to file those returns. Here, each of her as-filed returns bore the name and signature of a preparer, William Tapscott—who, as bank records abundantly revealed, was the Murphys' regular accountant. Documents recovered from the clinic—which Mrs. Murphy managed—further disclosed that she authorized Tapscott to file her returns. Those recovered documents included prepared but unsigned copies of tax returns with figures largely identical to those in the as-filed returns. And they included official documents entitled "IRS e-file Signature Authorization" that authorized "Tapscott Accounting Service" to file Mrs. Murphy's tax documents. A juror could reasonably infer from this evidence that Mrs. Murphy caused

the 2013 to 2015 tax returns to be filed by authorizing Tapscott to submit them with her signature PIN.

The evidence was sufficient for the third and fourth elements too—i.e., (3) that Mrs. Murphy knew her tax returns contained materially false information and (4) that they actually did. To fully report her personal income on her tax returns, Mrs. Murphy needed to fully report her NAPS partnership income, which "flow[ed] through to" her personal income return. But the government presented evidence that she materially understated her NAPS partnership income by diverting substantial amounts of such income—via cash deposits—into her CMEO and personal accounts. As evidence revealed, those accounts saw large and unexplained cash deposits. Mrs. Murphy's personal accounts alone saw over $52,000 in unexplained cash deposits in 2013, over $63,000 in 2014, and over $82,000 in 2015. And in total, the cash deposits on those accounts and the CMEO account added up to about $750,000 for the 2013 to 2015 tax years. Mrs. Murphy provided no explanation at trial as to where those large cash sums came from, and a testifying IRS agent who had reviewed the Murphys' and NAPS's bank records could not identify a source of income other than NAPS income either. Witnesses testified about Mrs. Murphy's suspicious handling of copay cash—she stuffed that cash in her purse, asked urine collectors to hide the cash in her house or use it to buy cashier's checks payable to CMEO, and even asked one collector to lie to law enforcement about where the money for the cashier's checks came from. Because the cash deposits were not reported as clinic income, they were not taxed as partnership income on Mrs.

Murphy's tax filings. Given the evidence of Mrs. Murphy diverting clinic partnership income to other accounts via untaxed cash deposits, a juror could reasonably conclude that she gave false information on her personal income returns (which, again, hinged on her partnership income) and that she *knew* those returns to be materially false. The evidence underlying her tax fraud convictions is sufficient.

## B.

The Murphys also argue that the jury instruction for the drug conspiracy charge was erroneous under *Ruan v. United States*, 597 U.S. 450 (2022) ("*Ruan II*"). But this argument, as we explain below, is foreclosed by our decision in *Ruan III*.

We review *de novo* whether a jury instruction "misstated the law or misled the jury to the prejudice of the objecting party." *United States v. Cochran*, 683 F.3d 1314, 1319 (11th Cir. 2012). "Where the error is the omission of an element of the crime we will reverse unless it can be shown the error was harmless beyond a reasonable doubt." *Ruan III*, 56 F.4th at 1296.

In *Ruan II*, the Supreme Court decided what *mens rea* the government needed to prove to convict a physician for unlawful prescribing under 21 U.S.C. § 841(a). The Court concluded that if a defendant was authorized to prescribe a controlled substance (for instance, a doctor defendant), the government must prove not only that the doctor knew he was prescribing the drugs, but also that he knew or intended that the prescription was unauthorized. *See Ruan II*, 597 U.S. at 454–55, 457–61. Here, the district court vacated Dr.

Murphy's substantive drug distribution conviction (Count 3) under section 841, on the grounds that the jury instruction behind that conviction did not comply with *Ruan II*. The Murphys argue that because the jury instructions for the section 841 substantive drug distribution charge were given in error, the instruction for the Count 1 drug *conspiracy* charge, *see* 21 U.S.C. § 846, was erroneous too.

That logic is incorrect. *Ruan III* addressed this very issue. There, we had to decide how *Ruan II*'s holding on the *mens rea* needed for a substantive drug offense applied to a conspiracy drug offense. Though we vacated the defendants' substantive drug convictions under section 841, we held that there was no error in a section 846 drug conspiracy jury instruction nearly identical to the one the district court used here. *See Ruan III*, 56 F.4th at 1298–99. Our explanation was simple: to find a defendant guilty of conspiracy, "[t]he jury would need to find that the defendant knew the illegal object of the conspiracy." *Ruan III*, 56 F.4th at 1299. And to find that the defendant knew the "aim of [his] agreement was illegal," the jury had to find that he (1) knew he was dispensing a controlled substance and (2) knew he was doing so in an unauthorized manner. *See id.* "If the jury concluded that the defendant did not know either of these things, then they could not conclude the defendant knew the illegal object of the conspiracy and could not vote to convict." *Id.*

Here, like in *Ruan III*, the district court instructed the jury that to convict the Murphys on drug conspiracy, the jury had to

find that the Murphys agreed to accomplish a shared "unlawful plan to dispense controlled substances without a legitimate medical purpose or outside the usual course of professional practice," and that they "knew the unlawful purpose of the plan and willfully joined it." *Compare with Ruan III*, 56 F.4th at 1299 (jurors instructed to convict under section 846 only if the defendants agreed to accomplish "'a shared unlawful plan to distribute or dispense . . . the alleged controlled substance or substances'" and "'knew the unlawful purpose of the plan and willfully joined it'"). Thus, like in *Ruan III*, the jury had to find that the Murphys knew their drug distribution plan was unlawful—and, necessarily, that they knew they were dispensing drugs in an unauthorized manner. So applying *Ruan III*, we conclude the district court's instruction under section 846 conveyed the proper *mens rea* requirement to the jury.

The Murphys seem to concede that *Ruan III* runs "contrary" to their arguments, but then to ask that we abandon *Ruan III* altogether. To the extent they make this invitation, we decline it. In *United States v. Duldulao*, a defendant asked us to abandon *Ruan III* and pointed to a Tenth Circuit decision holding "that a faulty § 841 instruction 'infected' each of the defendant's convictions, including the conspiracy conviction under § 846." 87 F.4th 1239, 1253 (11th Cir. 2023) (quoting *United States v. Kahn*, 58 F.4th 1308, 1311, 1322 (10th Cir. 2023)). But we rejected the defendant's request because "the Tenth Circuit's decision in *Kahn* does not deny our prior precedent rule its force," and "under our prior panel precedent rule, *Ruan III* controls." *Duldulao*, 87 F.4th at 1253. So too here.

Seeking to evade *Ruan III*, the Murphys attack the drug conspiracy instruction's use of the language "without a legitimate medical purpose or outside the usual course of professional practice." Pointing to *Ruan II*, they argue that a doctor could know his prescription lacked such a purpose and was made outside the usual course of professional practice, but still not know the prescription was "unauthorized." But *Ruan II*—which concerned *whether* a doctor must know his prescription was unauthorized, *see* 597 U.S. at 454–55—never redefined "unauthorized." To the contrary, it explicitly "assume[d]" that "a prescription is 'authorized' and therefore lawful" only when it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." *Ruan II*, 597 U.S. at 455 (quoting 21 C.F.R. § 1306.04(a)). And in *Ruan III*, when reasoning why one who knows his drug distribution plan is unlawful necessarily knows that drugs dispensed as planned are done so in an unauthorized manner, we stated that had the jury concluded the defendants "believed their actions to be for a *legitimate medical purpose*," it could not have also found they knew their plan was unlawful. 56 F.4th at 1299 (emphasis added). In other words, we recognized that a prescription "without a legitimate medical purpose" necessarily is an "unauthorized" one.

Lastly, the Murphys contend that because the drug conspiracy instruction did not define an "unlawful plan," it "incorporated" the substantive drug offense instructions given in error. But this contention fails for two reasons. First, the drug conspiracy instruction never cross-referenced the substantive drug offense

instructions: for instance, the former did not instruct the jury to pull the definition of a term from the latter, even if the conspiracy and substantive instructions used some of the same terms. Second, the jury need not have first heard a fuller definition of "unlawful plan" for *Ruan III*'s logic to obtain. One does not need dictionary definitions of the words "unlawful plan," to conclude that a defendant who knows his plan to dispense drugs is unlawful also knows that in dispensing those drugs as planned he would be doing so in an unauthorized manner. *Ruan III* did not hinge its approval of the section 846 drug conspiracy instruction upon whether it first defined an "unlawful plan." Neither do we.

## C.

Next, Mrs. Murphy contends that the district court abused its discretion by denying her motion for a mistrial after her accountant, Tapscott, invoked his Fifth Amendment rights and discontinued his trial testimony. The government called Tapscott, and he began his testimony by telling the jury about his career background and his relationship with the Murphys. He had just started discussing his preparation of CMEO's taxes when the court, concerned that Tapscott might incriminate himself, stopped his testimony and advised him to obtain a lawyer. The next day, outside the jury's presence, Tapscott elected not to continue testifying. The court then instructed the jury to disregard all of Tapscott's testimony from the previous day. Later, the court repeated that instruction when the jury submitted a clarifying question about which witness's testimony to disregard. Mrs. Murphy insists,

however, that the court's curative instructions were "less effective than putting a Band-Aid on a bullet wound," and so a mistrial was warranted. We disagree.

We review the denial of a motion for mistrial for an abuse of discretion. *United States v. Gallardo*, 977 F.3d 1126, 1138 n.8 (11th Cir. 2020). "A defendant is entitled to a mistrial only if [she] shows substantial prejudice, meaning that it is reasonably probable that, but for the alleged error, the outcome of the trial would have been different." *Id.* at 1138. When the court gives a curative instruction, as it did here, we presume the jury followed the instruction. *See id.* As we have stated: when a court "admi[ts] and later exclu[des] evidence, an instruction to disregard evidence withdrawn from the jury is sufficient grounds" for affirmance "unless the evidence is so highly prejudicial as to be incurable by the trial court's admonition." *United States v. Nicholson*, 24 F.4th 1341, 1354 (11th Cir. 2022) (quotation marks omitted).

Mrs. Murphy has not established such prejudice. She has failed to argue what impact, if any, Tapscott's brief un-cross-examined testimony bore on the outcome of her trial. After explaining his background in accounting, Tapscott discussed Mrs. Murphy's control of CMEO and his cashier's check purchases for CMEO. But other witnesses, including a urine collector, a maintenance worker, and a sales representative, also testified to the same or similar facts. Tapscott's only unique testimony was that Mrs. Murphy gave him "a sheet of paper with all the expenses and the trips and stuff and the income of the [CMEO] foundation" to file tax documents for

CMEO. But this minor detail on how he prepared CMEO's tax filings—or, at most, on the inadequacy of that preparation—had little to no connection to Mrs. Murphy's tax fraud charges, which alleged that she *lied* on her *personal* tax returns.

To be sure, as Mrs. Murphy observes, Tapscott also testified that he prepared her personal returns. But the jury would have known that fact even without hearing Tapscott's testimony, because "IRS e-file Signature Authorization" documents disclosed that Tapscott was authorized to file Mrs. Murphy's tax documents, and because three of her as-filed tax returns bore Tapscott's name and signature as their preparer. True, as Mrs. Murphy points out, those tax returns were formally admitted into evidence during Tapscott's later stricken testimony. But Tapscott's testimony was not necessary to the admission of these exhibits, the exhibits were admitted without objection, the government did not ask Tapscott any questions about the exhibits, and an IRS agent later discussed the exhibits without objection—and was cross-examined about them by the defense—after Tapscott's aborted testimony.

Nothing about Tapscott's testimony was so prejudicial that its admission was "incurable." *Nicholson*, 24 F.4th at 1354 (quotation marks omitted). We cannot say the district court abused its discretion by denying Mrs. Murphy's motion for a mistrial.

### D.

The Murphys also challenge the district court's exclusion of good care evidence. At trial, they sought to have a few of Dr. Murphy's patients—ones not mentioned in the superseding indictment

or during the government's case—testify about how he had provided them with good care. The Murphys asserted that those patients could testify, among other things, that "they received beneficial treatment," that some were prescribed fewer opioids over time, and that Mr. Murphy sometimes "discontinued" prescriptions for creams and braces that were not effective. The district court excluded the evidence, reasoning that Dr. Murphy was not charged for his acts against "every single patient," and that "showing other patients as good character evidence" was a "problem." *See* Fed. R. Evid. 404(a)(1).

We review a court's exclusion of evidence, including good care evidence, for an abuse of discretion. *United States v. Ifediba*, 46 F.4th 1225, 1238 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 2586 (2023); *see also United States v. Machado*, 886 F.3d 1070, 1086 (11th Cir. 2018). That standard "allows for a range of choice," which "means that sometimes we will affirm even though we might have decided the matter differently in the first instance." *Doe v. Rollins Coll.*, 77 F.4th 1340, 1347 (11th Cir. 2023), *cert. denied*, 144 S. Ct. 1056 (2024).

We cannot say the district court abused its discretion here. Federal Rule of Evidence 404(a)(1) prohibits the use of "[e]vidence of a person's character or character trait . . . to prove that on a particular occasion the person acted in accordance with the character or trait." *United States v. Ahmed*, 73 F.4th 1363, 1384 (11th Cir. 2023). As we have stated, "[e]vidence of good conduct is not admissible to negate criminal intent." *United States v. Camejo*, 929 F.2d 610, 613 (11th Cir. 1991). And, even when character evidence is

admissible—for instance, to prove a pertinent trait such as honesty in a fraud case—that evidence cannot consist of specific instances of past conduct unless the trait itself is an "essential element" of the charge. *Ahmed*, 73 F.4th at 1384. Under these principles, testimony about specific instances of Dr. Murphy providing good care to some patients—for example, by discontinuing or reducing their prescriptions—cannot be used to prove whether he unlawfully dispensed drugs to other patients, or conspired to do so, as charged in the indictment. *See id.* (character testimony was correctly excluded because it would have covered a defendant's "specific acts" unrelated to his criminal charges and be used to negate criminal intent).

The Murphys contend, however, that excluding the good care evidence violated their Sixth Amendment right to present a defense. "Whether the exclusion of the evidence violated a constitutional guarantee is a legal question that we review *de novo*." *Ifediba*, 46 F.4th at 1237.

As we have stated, "[i]mplicit in a criminal defendant's constitutional rights under the Fifth and Sixth Amendments is the right to present evidence in his . . . favor." *Machado*, 886 F.3d at 1086. To decide whether a defendant's constitutional right to present a defense was violated, we engage in a two-step analysis, asking: first, whether that right was violated; and second, if so, whether the error was harmless beyond a reasonable doubt. *United States v. Hurn*, 368 F.3d 1359, 1362–63 (11th Cir. 2004).

As to the first step, we outlined in *Hurn* four categories of evidence that a defendant generally has a constitutional right to

present: (1) "evidence directly pertaining to any of the actual elements of the charged offense or an affirmative defense"; (2) "evidence pertaining to collateral matters that, through a reasonable chain of inferences, could make the existence of one or more of the elements . . . more or less certain"; (3) "evidence that is not itself tied to any of the elements . . . but that could have a substantial impact on the credibility of an important government witness"; and (4) "evidence that, while not directly or indirectly relevant to any of the elements of the charged events, nevertheless tends to place the story presented by the prosecution in a significantly different light, such that a reasonable jury might receive it differently." *Id.* at 1363. Importantly, "[e]ven when one of the four circumstances listed in *Hurn* is present, 'otherwise relevant evidence may sometimes validly be excluded under the [Federal] Rules of Evidence.'" *Machado*, 886 F.3d at 1085 (quoting *Hurn*, 368 F.3d at 1363 n.2). And as we observed only a few years ago, the Supreme Court "has never held that a federal rule of evidence violated a defendant's right to present a complete defense." *United States v. Mitrovic*, 890 F.3d 1217, 1222 (11th Cir. 2018).

The Murphys argue that the proffered good care evidence fell under the first, second, and fourth *Hurn* categories. We address each of these categories in turn.

The first *Hurn* category does not apply. The Murphys argue that the good care testimony directly pertained to the "knowledge" or "intent" element of their charged offenses. *See e.g.*, *Louis*, 861 F.3d at 1333 (drug conspiracy charge required proof that defendant

"knew" of the conspiracy). We disagree. That Dr. Murphy knowingly or intentionally mistreated some patients is not rebutted by the fact that he treated *other* patients properly. *See United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008) (quoting *United States v. Marrero*, 904 F.2d 251, 260 (5th Cir. 1990) ("The fact that Marrero did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment.")).

*Hurn*'s second category does not help the Murphys either. They argue that the good care testimony could rebut the government's apparent "collateral" assertion that their clinic was "illegitimate"—from which, they argue, the jury could infer that Dr. Murphy knowingly prescribed drugs in an unauthorized manner. *See Hurn*, 368 F.3d at 1353. But whether Dr. Murphy mistreated the patients as alleged in the indictment and the government's case did not turn on NAPS's legitimacy as a whole. In fact, government witnesses testified about the clinic's "many aspects of good care," including, for instance, its "proper paperwork" on mental status, "a compilation of external records," "drug testing on the initial visit," and warnings "not to mix the pain medications with alcohol." But similar to above, there is no conflict between NAPS providing legitimate care to some patients at some moments, and the Murphys knowingly mistreating other patients at others. To put it differently, even if the good care testimony added to NAPS's legitimacy, doing so would not make it "more or less certain" that the Murphys knowingly mistreated the patients that trial evidence established they mistreated.

The Murphys finally rely on *Hurn*'s fourth category. They argue that the proffered good care testimony—even if irrelevant to an element of a charged offense—would place the prosecution's "story . . . in a significantly different light," *Hurn*, 368 F.3d at 1363, by dispelling the "taint of the portrayal of Dr. Murphy's clinic as illegitimate." We are not convinced. Again, evidence already suggested that NAPS was not an entirely illegitimate clinic. Witnesses testified about Dr. Murphy or his clinic providing patients with good care. Dr. Murphy's expert testified, in his expert opinion, that Dr. Murphy had issued legitimate prescriptions for patients whose files the expert reviewed. And Dr. Murphy himself gave testimony—which the jury was free to disbelieve, *Rivera*, 780 F.3d at 1098—about his clinic's policies, procedures, and practices in treating patients; about aspects of his good care; and that he "loved [his] patients." Given this testimony in the Murphys' favor—and, given the strong evidence of the Murphys mistreating *some* patients—more good care testimony would not have casted the evidence in a "significantly" different light. *Id.* at 1363.

Our decision in *United States v. Ifediba* supports our analysis. *See* 46 F.4th 1225. There, the district court excluded good care evidence purportedly "showing that [Ifediba] provided legitimate medical treatment to some patients." *Id.* at 1238. The defendant argued that the exclusion violated his "constitutional right to present a complete defense" because his good care testimony could have placed the prosecution's story in a "'significantly different light.'" *Id.* (quoting *Hurn*, 368 F.3d at 1363). We disagreed. Evidence that "Ifediba lawfully treated some patients" was "no defense," we

explained, because "the government never alleged that Ifediba un-lawfully treated every patient" and even "conceded that his treat-ment of some patients was legitimate." *Ifediba*, 46 F.4th at 1238. The same is true here, where the government acknowledged in-stances of Dr. Murphy properly treating his patients but then stated that "this case . . . is about the times he didn't" provide "good care." And, we reasoned in *Ifediba*, the district court did not abuse its dis-cretion in excluding the good care evidence because Rule 404 for-bade the use of it to negate criminal intent. *Id*. That is the same reasoning we applied above.

## E.

In their final challenge to their convictions, the Murphys ar-gue that they are entitled to a new trial due to the cumulative error doctrine. Under that doctrine, "an aggregation of non-reversible er-rors (i.e., plain errors failing to necessitate reversal and harmless error) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Chalker*, 966 F.3d 1177, 1193 (11th Cir. 2020). But here, the district court committed no er-rors. Because we are "left with no errors to accumulate," the Mur-phys' cumulative error challenge necessarily fails. *See id*. at 1193–94.

## F.

We now address Dr. Murphy's sentencing challenges. We review a district court's factual findings at sentencing for clear er-ror, and its interpretation and application of the Sentencing

Guidelines *de novo*. *See United States v. Stein*, 846 F.3d 1135, 1151 (11th Cir. 2017); *United States v. Bradford*, 277 F.3d 1311, 1312 (11th Cir. 2002).

At sentencing, the district court calculated that Dr. Murphy's guidelines range, with statutory maximums stacked, *see* U.S.S.G. § 5G1.2(d), was 1,140 months in prison. The government requested a guidelines sentence of 1,140 months. Dr. Murphy requested a sentence of five years of home confinement. The district court downwardly varied and sentenced Dr. Murphy to 240 months in prison.

Dr. Murphy challenges his sentence by arguing that (1) the district court miscalculated his guidelines range by miscalculating the loss amount and drug quantity and (2) even if the court's calculations were correct, his sentence is substantively unreasonable. The government argues that, under *United States v. Keene*, 470 F.3d 1347 (11th Cir. 2006), we need not review Dr. Murphy's guidelines objections because the district court stated it would have imposed the same sentence even absent the alleged errors and because that sentence, absent those errors, would still have been reasonable. We agree with the government: the district court made *Keene* findings, and the sentence imposed would have been reasonable even if Dr. Murphy's guidelines objections were sustained. Logically, we also conclude that under the higher guidelines range the court *did* calculate, Dr. Murphy's sentence was substantively reasonable.

1.

We first ask whether the district court made a *Keene* finding. It did. In *Keene*, we declined to consider a defendant's argument about a sentencing enhancement because "the district court told us that the enhancement made no difference to the sentence it imposed." 470 F.3d at 1348. Since then, we have held that if a district court states that it would have imposed the same sentence even absent an alleged error—i.e., makes a *Keene* finding—we will affirm the court so long as the sentence imposed, even absent the alleged error, would have been substantively reasonable. *See id.* at 1349; *United States v. Grushko*, 50 F.4th 1, 18 (11th Cir. 2022); *United States v. Goldman*, 953 F.3d 1213, 1221 (11th Cir. 2020). By declining to consider sentencing objections on appeal in such cases, we "avoid pointless reversals and unnecessary do-overs of sentence proceedings." *Grushko*, 50 F.4th at 18 (quotation marks omitted).

Here, the district court stated at sentencing that "the sentence actually given would have been the same regardless of how the guideline issues had been resolved." The court explained that "if the calculation should have been actual loss as opposed to intended loss, and Count 1 is somehow or another thrown out, I'm varying upward, and given the opportunity to resentence [Dr. Murphy], I would vary upward again for the same calculation." The court elaborated: "So, if I have to see him again, I want to make sure that's clear. . . . [I]f I somehow or another messed up those, the calculation—my sentence, I believe, would nonetheless be reasonable." These statements amounted to a *Keene* finding. *See*

*Goldman*, 953 F.3d at 1221 (*Keene* finding present when court "stated that it would have imposed the same sentence regardless" of the value of a stolen gold bar, an issue the defendant raised as to the court's total offense calculation).

Dr. Murphy argues that the district court made no *Keene* finding because it "failed to consider any alternative to its drug weight determination." We disagree. The record establishes that the court expressly considered alternative drug quantity (and thus, drug weight). For one, it was only after Dr. Murphy objected to "drug quantity calculation" at sentencing—and after the parties debated the issue and the court overruled the objection—that the court stated the sentence would have remained regardless of how the "guideline issues" were resolved. In context, "guidelines issues" included the drug quantity calculations. Second, the court stated that if "Count 1 is thrown out"—which would entail no drug weight because Count 1 charged drug conspiracy and no other conviction factoring into sentencing involved drug quantity calculations—"there would still be 240 months."

2.

Because the district court made a *Keene* finding, we now assess whether the sentence imposed would be substantively reasonable under sentencing factors in 28 U.S.C. § 3553(a), even if the guidelines issue were "decided in the way the [Dr. Murphy] argued and the advisory range reduced accordingly." *Keene*, 470 F.3d at 1349.

Dr. Murphy raised two guidelines issues. First, he argues that the district court's drug quantity determination was "factually baseless." Second, he argues that the court miscalculated the "loss" amount under U.S.S.G. § 2B1.1—an amount that escalated his offense level for his fraud-related convictions—because the court included "intended" instead of only "actual" loss in its calculations.

If Dr. Murphy prevailed on these two issues—i.e., if the court entirely ignored his Count 1 drug conspiracy conviction (thus reducing drug weight to zero) and calculated loss to only include "actual" loss—his total offense level would have been level 35. The district court, the government, and Dr. Murphy all agree. Based on a total offense level of 35, the guidelines range would have been—as the government and Dr. Murphy also agree—168 to 210 months.

It is Dr. Murphy's burden "to prove that his sentence is unreasonable in light of the record and § 3553(a)." *Keene*, 470 F.3d at 1350. Here, he has not established that his 240-month sentence was unreasonable if the guidelines range were 168 to 210 months.

In assessing a sentence's reasonableness, we have stated that the sentence "must be sufficient, but not greater than necessary to comply with the purposes listed in 18 U.S.C. § 3553(a)." *Grushko*, 50 F.4th at 19 (quotation marks omitted). "The court must consider all of the § 3553(a) factors, but it may give greater weight to some factors over others or even attach great weight to a single factor." *Id.* And, it need not "state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553(a) factors." *United States v. Kuhlman*, 711 F.3d 1321, 1327 (11th

Cir. 2013). We will vacate a sentence only if we have a "definite and firm conviction that the district court committed a clear error of judgment in weighing" the sentencing factors. *Grushko*, 50 F.4th at 19 (quotation marks omitted).

Here, the 240-month sentence was substantively reasonable even under a guidelines range of 168 to 210 months. The district court discussed the section 3553(a) factors at length. It discussed the seriousness of the offense, pointing to the "huge amount" of money stolen, and "the lives that [the Murphys] participated in destroying" through their drug distribution and theft. *See* 18 U.S.C. § 3553(a)(2)(A). It stated that its sentence reflected "the need to promote respect for the law and to provide just punishment for this offense." *See id*. It explained that the sentence "also acts as a deterren[t] for other criminal conduct" including "other people that are considering whether or not they can steal like this." *See id*. § 3553(a)(2)(B). It considered Dr. Murphy's "characteristics," *id*. § 3553(a)(1), including that he was 66 years old. And even if Count 1 were vacated, the 240-month sentence would still be years below the statutory maximums for Counts 5 to 11 and Count 22. *See* 18 U.S.C. §§ 371, 1347, 1349; 42 U.S.C. § 1320a-7b(b)(1). Because of these reasons, we conclude that even if the guidelines range were 168 to 210 months, a sentence of 240 months—a 30-month upward variance—would be reasonable. *See Grushko*, 50 F.4th at 19–20 (a 145-month sentence on an assumed guideline range of 75 to 87 months was reasonable where district court discussed the section 3553(a) factors); *United States v. Riley*, 995 F.3d 1272, 1280 (11th Cir. 2021) ("an additional sign of the upward variance's

reasonableness is the fact that Riley's 70-month sentence is more than 4 years below his 10-year statutory maximum").

### 3.

Left remaining is Dr. Murphy's argument that even under the guidelines range the court *did* calculate—1,140 months—the 240-month sentence is substantively unreasonable. But the foregoing considerations justify the same sentence here.

### III.

For the reasons above, we **AFFIRM** the Murphys' convictions and sentences.

23-10781                JORDAN, J., Concurring                    1

JORDAN, Circuit Judge, Concurring:

With the exception of Part II.D., I join Judge Brasher's thorough opinion for the court.  I write separately on two of the issues raised by the Murphys.

First, I agree that the Murphys' challenge to the drug conspiracy instruction is foreclosed by our prior decision in *United States v. Ruan*, 56 F.4th 1291, 1298–99 (11th Cir. 2023) (*Ruan III*).  But if we were writing on a clean slate, I would find the Tenth Circuit's contrary decision in *United States v. Kahn*, 58 F.4th 1308, 1311 (10th Cir. 2023), more persuasive.

Second, I acknowledge that under our cases—namely *United States v. Ruan*, 966 F.3d 1101, 1156–58 (11th Cir. 2020) (*Ruan I*), *vacated*, 142 S. Ct. 2895 (2022) (*Ruan II*), *reinstated in relevant part*, *Ruan III*, 956 F.4th at 1295 n.1, and *United States v. Ifediba*, 46 F.4th 1225, 1237–38 (11th Cir. 2022)—the district court did not abuse its discretion in excluding the Murphys' so-called "good care" evidence.  I therefore concur in the judgment as to Part II.D. of the court's opinion.

It seems to me, however, that where—as here—the government tries to paint a medical clinic as a pill mill with hundreds of patients a day, the defendants who ran the clinic are entitled to put on evidence that many of their patients received good care under medically-accepted standards.  The government's insinuation is that if proper care is not being provided most of the time, then it is a fair inference that the prescriptions for the patients mentioned in the indictment were not legitimate.  The defendants should be

2                    JORDAN, J., Concurring                    23-10781

entitled to counter the impression the government is trying to convey. *See, e.g., United States v. Word*, 129 F.3d 1209, 1212–13 (11th Cir. 1997) (reversing conviction because the defendant "was not afforded the opportunity to present evidence to counter the government's argument" as the government's "trial strategy made this defense evidence highly significant").